**J.L.P.(H.), Petitioner-Respondent,**

v.

**D.J.P., Respondent-Appellant.**

**No. WD33116.**

Missouri Court of Appeals,
Western District.

Dec. 14, 1982.

David T. Greis, Kansas City, for respondent-appellant.

Buford L. Farrington, Independence, for petitioner-respondent.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

DIXON, Judge.

The husband appeals from a trial court order specifying scheduled visitation rights of the father, denying the father overnight visitation privileges, and limiting the father's visitation rights by directing that visitation not be exercised by taking the child to a church at which a large proportion of the congregation are homosexuals or by taking the child to "gay activist social gatherings." The father, an avowed homosexual, appeals asserting a variety of errors centering primarily upon lack of evidentiary support and claimed constitutional violation.

The husband and wife were married in 1968. A child was born in 1969 and had not reached his twelfth birthday at the time of the hearing. At the hearing, the father testified that the original divorce granted in Johnson County, Kansas, restricted his visitation by denying him the right to have the child overnight and that he accepted that restriction out of fear of being denied visitation altogether.

Following the divorce, the father lived at various locations and on some occasions had overnight visitation with the child. Since the divorce, the father admitted to sexual relations with one woman and with two men whom the father characterized as "lovers," one for a period of a year and another for a period of eight months. He also admitted to homosexual relationships with ten to twelve other men since the divorce. Three or four of these latter individuals were introduced to the son at the father's home on the occasions of visitation. The father presently occupies an apartment jointly with another homosexual male, but denies any homosexual involvement with this person. The father advocates a homosexual lifestyle and has discussed with his son his homosexual behavior. He thinks it would be "desirable" for his son to be homosexual. The father has taken the child to a church which was described by its pastor as "a Christian church with a primary outreach for historical needs to the gay community." The pastor also indicates that over half of the church membership were homosexual persons. The father also presented the evidence of two psychologists whose testimony may be summarized by saying that they were of the opinion that the child suffered at the present time no psychological damage arising from his association with his father. Both of them testified that there are three theories of the causation of homosexuality: the theory of genetic causation, a theory that it is a form of sexual impairment, and the behavorists' theory that it is a learned response. Both

of the witnesses opined that the sexual impairment theory was correct. According to that theory, the sexual preference of a child is determined at age four or five and no subsequent conditioning can change that preference once established. Both of the witnesses agreed that there is no proven theory of causation of homosexuality. Both of the witnesses asserted that most child molestation occurs between adult heterosexual males and female children, one of them going so far as to say that child molestation was approximately 95% heterosexual and that homosexual molestation is rare.

The mother testified at some length concerning the episodes of visitation since the divorce and her beliefs concerning the adverse effect upon the child of visitation with his father overnight. Significantly, she testified that the child's "bedwetting" has become more of a problem recently. She testified that on one occasion when the father took the child out of the state for a period of several days the time was spent in the company of another homosexual and his juvenile nephews. The boy was questioned by the court and was aware of the issue involved with respect to his father's behavior. He was aware his father's friends were mostly homosexuals, knowledge he had gained from his father. He was aware that the church he attended was a "gay" church. The boy has not told his friends of his father's sexual preference. The boy stated that his father had never been around any of his friends from school nor had his friends ever gone with him to visit his father.

Some additional background concerning the appeal requires mention. The trial court ordered the records sealed for the purpose of protecting the child's identity in view of the circumstances of the case. When the father's brief was filed, it was filed with the names of the parties and the child in full. An inquiry by media sources for access to the file prompted this court to enter an order continuing the trial court's order to preserve the anonymity of the child. The order required the parties to file pleadings in this cause designating the parties only by initial and this opinion follows that procedure. The parties remain under this court's order to preserve the anonymity of the child in these proceedings. Likewise, the portion of that order sealing the record on appeal is continued insofar as the records may contain references to the identity of the parties and the child. During the pendency of the appeal, a request was received from the Lambda Legal Defense and Education Funds, Inc., for leave to file a brief *amicus curiae,* which was denied.

The appellant father has filed a voluminous brief raising ten points with numerous subpoints. The appellant father's brief and oral argument indicate a desire on the father's part to convert this appeal into a wide ranging inquiry into the constitutional and marital rights of homosexual fathers. In view of the posture of this case and the evidence presented, it is unnecessary to address many of the issues which the father purports to raise on this appeal, nor is it necessary to discuss point by point the assertions made in the brief of the father.

The basic thrust of the father's argument rests upon the premise that the record in this case does not support the factual findings of the trial court and that, therefore, the trial court erred in placing restrictions upon the father's visitation with the child.

The father in his brief in three separate points makes a direct attack upon the findings of fact by the trial court. These "points" overlap and to some extent are not separate points. Paraphrasing these points and drawing upon the argument portion of the brief for explication, they may be summarized as follows.

The father argues, first, the trial court ignored the uncontradicted expert evidence of the psychologists. The argument further is that this rendered improper the trial court's findings that the father believes it to be in the best interests of the son to expose him to a homosexual environment, that the father hopes that the son will be a homosexual and thinks that desirable, that the father's purpose is to justify his homosexuality and encourage his son to become a

homosexual. The father also argues that the trial court's characterization of the father's activities as "seductive in nature" and detrimental to the best interests of the child is refuted by this "expert" testimony.

Reviewing the evidence adduced and responding to the claim that the trial court ignored the psychological evidence presented, it is apparent that the court did not ignore the psychological evidence. Both the psychology "experts" testified that there was no concensus as to the cause of homosexuality. They both indicated that there is a theory of the causation of homosexuality which considers it to be linked in terms of causation to environmental influences or learned behavior, although both opined that they did not support that theory.

In considering this record, it must be understood that the psychologists did not testify to scientific facts generally accepted in the scientific community. They were espousing only their opinions upon theories of causation, which they both admitted were not subject to any demonstrable scientific proof.

The father recognizes the general principle that ordinarily expert testimony is not binding upon the trier of fact. Nonetheless, the father insists this record compels the court to accept the testimony of the psychologists. As authority for his proposition, the father cites *Phillips v. Union Electric Company,* 350 S.W.2d 432 (Mo.App. 1961), and *Kane v. St. Louis Refrigerator Transit Company,* 83 S.W.2d 593 (Mo.App. 1935). Both of these cases from the eastern district rely upon citations from C.J.S., *Phillips* citing 32 C.J.S. *Evidence* § 569 at p. 399,[1] and *Kane* citing as support for the proposition 22 Corpus Juris, at 728–30.

Even a casual examination of the C.J.S. citation shows that the quoted portion of the text of the encyclopedia represents a minority view. No Missouri cases are offered to support the text relied upon except the bootstrapping citation of *Kane* which, of course, relied upon the text itself for its only authority. The great weight of authority, both in Missouri and elsewhere, is

that opinions of experts are not binding upon the trier of fact, and that is the black letter statement of the law found in 32 C.J.S. *Evidence* § 569(1)(a)(b)(c) (1964), including many Missouri cases cited in support of the black letter statement at footnote 61. Typical of the Missouri authority on the issue is *Baugh v. Life & Casualty Insurance Company of Tennessee,* 307 S.W.2d 660, 665 (Mo.1957), where it was said that testimony of physicians would not be conclusive upon the jury, and the statement in *Sunset Acres Motel, Inc. v. Jacobs,* 336 S.W.2d 473, 484 (Mo.1960), that the weight of uncontradicted expert testimony was for the jury. There may be occasions in which expert witnesses testify to scientific facts which are so generally accepted in the scientific community in which the experts have proficiency that their uncontradicted evidence concerning those scientific facts might present a different question. The evidence here presented is not of that nature. The recent case of this court, *B.S.H. v. J.J.H.,* 613 S.W.2d 453 (Mo.App. 1981), states the prevailing view as follows:

> In reality, scientific evidence does not by the mere appellation of the term acquire absolute verity but, like other evidence, it depends on qualitative factors which themselves tend to lend greater or lesser credence to the proof. In short, the scientific evidence depends on the methodology employed to obtain it and the skills of those who possess or claim to possess some expertise in the subject, all of which must be shown as essential to the proof.

*Id.* at 457.

The trial court was simply not required to accept the opinions of the experts. Their opinions could have been rejected by the court under the case law cited. There was evidence intrinsic to this record and the knowledge of the trial court which would seriously damage the credibility of the witnesses. The father in this case is himself an example of the weakness of the theory espoused by the expert witnesses, since the father has engaged in a heterosexual rela-

---

1. Currently, see 32 C.J.S. *Evidence* § 569(1), at p. 607 (1964).

tionship with the mother of this child and produced a child. He has engaged in heterosexual activity with, admittedly, one other woman since the divorce. He has, during the course of his marriage and subsequent to it, developed homosexual tendencies. The experts' testimony with respect to molestation of minors is likewise suspect. Every trial judge, or for that matter, every appellate judge, knows that the molestation of minor boys by adult males is not as uncommon as the psychological experts' testimony indicated. A few minutes research discloses the following appellate decisions involving such molestation. *State v. Westfall*, 367 S.W.2d 593 (Mo.1963); *State v. Oswald*, 306 S.W.2d 559 (Mo.1957); *State v. Counts*, 572 S.W.2d 885 (Mo.App.1978); *State v. Smith*, 540 S.W.2d 189 (Mo.App. 1976); *State v. Dayton*, 535 S.W.2d 469 (Mo.App.1976); *State v. Dayton*, 535 S.W.2d 479 (Mo.App.1976); *State v. Shumate*, 516 S.W.2d 297 (Mo.App.1974). It may be that numerically instances of molestation occur with more frequency between heterosexual males and female children, but given the statistical incidence of homosexuality in the population, which the father claims is 5 to 10%, homosexual molestation is probably, on an absolute basis, more prevalent. In any event, the father's acknowledgement that he was living with an avowed homosexual certainly augurs for potential harm to the child that the trial court was perfectly competent to assess. The testimony of the father also tends to support the inferences which the trial court drew with respect to the father's attitude. The father directly testified that he thought it would be "desirable" for his child to become a homosexual. He has taken pains to acquaint his child with the homosexual nature of the father's companions and inferentially by his association with them in the presence of the child given his approbation to their lifestyle and furnished the boy with role models consistent with that approbation. The whole tenor of the father's appeal and his conduct in the trial and appellate stages demonstrate that he is oriented towards the "cause" of homosexuality. The trial court could take into consideration the fervor of the father's

beliefs concerning homosexuality in assessing the possibility of harm to the child arising from that conduct which the trial court characterized as "seductive in nature." Whatever the father's rights may be—an issue which this court does not address—concerning his own choice of "lifestyle," those rights do not extend to activities designed to induce in a child similar behavior. The statutes of Missouri, § 566.-090.1(3), define deviate sexual intercourse with another person of the same sex as the crime of sexual misconduct, a Class "A" misdemeanor. Missouri courts have not relied upon such sexual offense statutes to provide an absolute basis for denial of custody or limitation of visitation. Prior to the new criminal code, adultery and fornication were likewise subject to criminal penalty. Proof of such offenses was weighed by courts in matrimonial disputes involving children in the light of the possible harm to the children involved. It is not as the father insists a question of the court's involvement in the morality of such behavior, it is the court's concern for potential harm to the child which requires consideration of such conduct by a court charged with determining the best interests of the child.

█ The findings of the trial court are not in error, either based upon the father's claim that the testimony of the psychologists was ignored, or upon the basis that the record does not support the factual inferences drawn by the trial court from the evidence presented. The trial court's findings thus present a factual premise that the child's physical or emotional welfare is threatened by the activities and conduct of the father, which affords a sufficient basis for the trial court to restrict the visitation of the father pursuant to § 452.400.2 RSMo 1978. This opinion need not address the father's contention that the trial court erroneously applied a change of circumstances test as opposed to the best interest of the child test in determining the visitation rights of the father. There is substantial evidence which would permit the trial court and this court to find that the potential for physical and emotional harm exists if the restrictions on visitation are not imposed.

The father also attacks the trial court's order limiting the father's activities during visitation by restricting the father from overnight visitation, taking his child to "gay activist social gatherings," and attendance at the church of the father's preference. In making these arguments, the father attempts to elevate his attack upon the restrictions to a constitutional status. The argument is convoluted, but proceeds in somewhat the following fashion. The father asserts that there is a rebuttable presumption that he is entitled to unrestricted visitation and that the evidence is insufficient to rebut that presumption, which the father asserts is a right of constitutional dimension. In support the father cites a number of decisions in other states. Significantly, however, the father admits that this is not an absolute right and concedes that when the evidence discloses that particular decisions of the parent may endanger the health or safety of the child the visitation may be restricted.

The case law indicates the accuracy of the father's concession that homosexual parents' rights may be restricted if, under the circumstances, the imposition of certain restrictions is in the best interests of the children. The Missouri Court of Appeals, Southern District, recently decided a case involving a lesbian mother who instituted proceedings to modify a divorce decree which originally granted custody of the parties' four children to the husband. *L. v. D.,* 630 S.W.2d 240 (Mo.App.1982). The mother sought custody of the two younger children. The trial court denied the change in custody and provided for visitation on the first weekend of each month, with the restriction that the female with whom the mother lived (or any female with whom the mother might be living) would not be in the children's presence or in the mother's home during such visits. In affirming the trial court's order, the southern district held that the mother did not have a constitutional right to unrestricted visitation and concluded from the trial court's findings that contact with their mother's lesbian lover would impair the children's emotional development. *Id.* at 245.

A review of cases from other jurisdictions involving restrictions on visitation points to two common restrictions: a prohibition against overnight visitation and sometimes a prohibition against visitation in the presence of other homosexuals. In a proceeding initiated under a writ of habeas corpus, the New York Supreme Court granted a change of custody from a lesbian mother to the father after finding that it was not in the best interests of the child to continue to remain with the mother, who lived with her lesbian lover. *In re Jane B.,* 85 Misc.2d 515, 380 N.Y.S.2d 848 (1976). The court awarded the mother reasonable visitation rights with the following conditions: that the child would not remain overnight or visit at the mother's home while her lover or other homosexuals were present; that the child would not be taken to any other place where known homosexuals were present; and that the mother would not involve the child in any homosexual activities or publicity.

The New Jersey Superior Court imposed similar restrictions on the visitation rights of a homosexual father who lived in a building occupied mainly by homosexuals, was very involved with gay activist groups, and had involved his children in such efforts. *In re J.S. & C.,* 129 N.J.Super. 486, 324 A.2d 90 (1974), *aff'd per curiam,* 142 N.J.Super. 499, 362 A.2d 54 (1976). The court found that it was not in the best interests of the children to continue unrestricted visitation and imposed several restrictions during visitation periods: that the father would not cohabit or sleep with an individual other than a lawful spouse; that the children would not be taken to a meeting hall for homosexuals; that the children would not be involved in any homosexual activities or publicity; and that the father's lover would not be present.

In *Woodruff v. Woodruff,* 44 N.C.App. 350, 260 S.E.2d 775 (1979); *Irish v. Irish,* 102 Mich.App. 75, 300 N.W.2d 739 (1980); and *DiStefano v. DiStefano,* 60 A.D.2d 976, 401 N.Y.S.2d 636 (1978), the courts affirmed lower courts' orders granting the homosexual parent overnight visitation, *conditioned* on the absence of any lovers, finding that

such restrictions were in the best interests of the children. And in *Kallas v. Kallas,* 614 P.2d 641 (Utah 1980), the court reversed the trial court's order awarding the lesbian mother overnight visitation privileges and remanded the case to admit evidence that the mother had made advances of a sexual nature to a young girl and had approached another female for drugs.

However, in *Ashling v. Ashling,* 42 Or. App. 47, 599 P.2d 475 (1979), the court deleted a restriction on the lesbian mother's visitation privileges which prohibited the presence of any lesbians during such visits. The Oregon view appears to be a minority view.

In the majority of cases involving the award of custody where one parent is a homosexual, the courts have awarded custody to the non-homosexual parent, again relying on the impact upon the child. In *D.H. v. J.H.,* 418 N.E.2d 286 (Ind.App.1981), the court affirmed the custody award to the non-homosexual father.

In *Jacobson v. Jacobson,* 314 N.W.2d 78 (N.D.1981), the court reversed a divorce decree which awarded custody to the lesbian wife. The court stated that it was not in the best interests of the children to allow them to live in the home where the mother was engaged in a homosexual relationship. In another case where custody was originally awarded to a lesbian mother, the decree was modified to transfer custody to the father because the mother chose to live with her female lover in an open, acknowledged homosexual relationship. *M.J.P. v. J.G.P.,* 640 P.2d 966 (Okl.1982). The court held that the mother's open, acknowledged relationship constituted a sufficient change of circumstances and affirmed the trial court's order transferring custody to the father.

The Missouri authority is to the same effect. In *N.K.M. v. L.E.M.,* 606 S.W.2d 179 (Mo.App.1980), a mother was awarded custody of her daughter on the condition that she discontinue her relationship with a woman alleged to be her lesbian lover. When the mother continued the relationship in violation of the decree, the trial court transferred custody to the father. The trial court order was affirmed. There was sufficient evidence of changed circumstances to support the trial court's order.

In two cases from foreign jurisdictions, the homosexual parent has been awarded custody and later successfully defended efforts to transfer custody in a motion to modify. In both cases, however, the courts rely heavily on facts showing no harm to the child. In *M.P. v. S.P.,* 169 N.J.Super. 425, 404 A.2d 1256 (1979), the court held that there were not sufficient changed circumstances to support the transfer of custody and reversed the trial court's order. The court took into account the fact that the husband was aware of the wife's sexual preference at the time of the divorce, that the mother refrained from displaying affection toward other women in the presence of the children and that she was not a member of any homosexual organizations. The court further noted that the father had some unusual sexual habits of his own and that placing the children with him would be more destructive to the children's welfare than custody with the mother. The court in *Schuster v. Schuster,* 90 Wash.2d 626, 585 P.2d 130 (banc 1978), also affirmed a trial court order denying a change of custody on the basis of the custodial mother's homosexuality because of a lack of showing of changed circumstances. The court did remand the case, however, directing the trial court to retain the restriction prohibiting the mother from living with her female lover.

The factual analysis of this record is a sufficient answer to this aspect of the father's supposed constitutional argument. The father's citation of cases from other states in which visitation was authorized with homosexual parents is of no persuasion in light of the record in this case.

■ The father likewise attacks the trial court order on due process grounds by asserting that the trial court prohibition against taking the boy to "gay activist social gatherings" is so vague and indefinite as to be over broad and, therefore, unconstitutional on due process and equal protection grounds. The father also asserts that the order constitutes a prior restraint under the

first amendment, citing broad general principles of first amendment law. It is first to be noted that there is no attempt by the trial court to dictate to the father with respect to any facet of his lifestyle, attendance at church, or rights of speech. What the trial court order has attempted to require is that the father exercise his visitation rights without exposing the child to the presence of persons who aggressively promote the practice of homosexuality, the "gay activists," and restrict the child's attendance at a church which supports the practice of homosexuality to the extent that it recognizes a "holy union" between homosexuals as the equivalent of marriage.

The record in this case is sufficient to authorize these restrictions upon the exercise of the father's visitation rights. In fact, the record would support an even broader prohibition upon the father's exercise of visitation in the presence of known homosexuals. If the father persists in his vehement espousal to the child of the "desirability" of his chosen lifestyle, even within the constraints of the present limitation, and that results in harm to the child, the authorities would support even greater restrictions upon his rights of visitation.

The judgment of the trial court is affirmed.

All concur.

