772 S.W.2d 786 (1989)
J.P., Petitioner-Appellant-Respondent,
v.
P.W., Respondent-Cross-Appellant.
Nos. 15937, 15981.
Missouri Court of Appeals, Southern District, Division Two.
May 5, 1989.
Motion for Rehearing and Transfer Denied May 31, 1989.
Application to Transfer Denied August 1, 1989.
Daniel T. Moore, L. Joe Scott, Poplar Bluff, for petitioner-appellant-respondent.
Therese A. Schellhammer, Little & Schellhammer, Poplar Bluff, for respondent-cross-appellant.
Motion for Rehearing and Transfer to Supreme Court Denied May 31, 1989.
MAUS, Judge.
The genesis of this proceeding is a Texas decree placing a two-year-old girl in the primary custody of her mother, but granting the father "possessory custody" for ten days every other month. The mother filed in the Circuit Court of Butler County, Missouri, a motion to modify by restricting visitation by the father to visitation in her presence. Upon hearing that motion, the circuit court entered a decree which included a provision that during the father's visitation or temporary custody "neither the Respondent's present lover nor any other male with whom the Respondent may be *787 residing shall be in the child's presence or in the Respondent's home during such visits." The mother appeals contending that restriction is not adequate. The father appeals contending the restriction was improperly imposed. The appeals have been consolidated for submission and disposition.
This court must at the outset consider the father's contention that only evidence of events occurring and circumstances existing since the entry of the Texas decree are admissible. As a general proposition, the father's contention is correct. Vandegriff v. Vandegriff, 695 S.W.2d 941 (Mo.App.1985). However, evidence of certain categories of prior and contemporaneous events and circumstances is admissible for a variety of purposes. For example, evidence of the testimony at the prior hearing is admissible to establish what facts were unknown to or concealed from the court. Jones v. Jones, 724 S.W.2d 615 (Mo. App.1986). Further, evidence of prior conduct is admissible if relevant for the purpose of evaluating the fitness of a parent to have custody of children. Pulliam v. Sutton, 728 S.W.2d 252 (Mo.App.1987). The admissibility of evidence for the latter purpose has been sagaciously expressed in a statement particularly applicable to this case.
In this connection appellant's Point IV complains of the court's receipt into evidence the testimony of S.L. which related to prior homosexual activities of appellant with that young boy. Appellant says that this could not be considered under § 452.410 because the facts elicited were known to the court at the original trial, and thus could not be a changed circumstance. The trial court here was not that which heard the original trial. It was certainly competent for the court to consider this evidence of appellant's prior conduct as it might bear upon his emotional stability and which in turn would bear upon the well-being of the child under § 452.400.
L.L.T. v. P.A.T., 585 S.W.2d 157, 159 (Mo. App.1979).
Within the limitations above observed, the following is a summary of the evidence of the background of the parties relevant to the mother's motion. The mother and father were natives of Iowa. They were married in Iowa. They later moved to Austin, Texas. There each attained the requisite degree at the University of Texas and became a registered nurse. The mother was employed in that capacity. The father worked as a research assistant and pursued graduate studies. The female child in question was born on May 13, 1986.
Under unexplained circumstances, the father met Harry Reed in May, 1985. Reed had been an active homosexual for six years. At that time the father and Reed had a sexual relationship. By October, 1986, their relationship had grown more serious and they were engaging in oral sex on a regular basis. After his homosexual encounter with Reed, the father continued to have normal sexual intercourse with the mother.
The father first told the mother of his homosexuality in December, 1986. The mother left Austin and established her home and that of the baby with her parents in Iowa. The petitioner and her mother and father and brother returned to Austin to obtain the wife's belongings. After the father and brother had left with a truck containing those belongings, the respondent arrived at the parties' home. He encountered his mother-in-law and the petitioner. The respondent, who was 6 feet 2 inches tall and weighed approximately 230 pounds, first grabbed the mother-in-law. Then he engaged in a fight with the petitioner concerning whether or not the mother would take an automobile.
At the time of the initial hearing in Texas on May 4, 1987, the wife and child were living in Puxico, Missouri. She was working as an assistant in her brother's veterinary clinic. The father was living in an apartment in Austin with his homosexual lover, Harry Reed. At the hearings in Texas, there was presented to the court the issue of whether or not Harry Reed should remain in the father's home during visitation by the child. Transcripts of some of the hearings in Texas were filed with the trial court and are now before this court. *788 The four transcripts filed disclose that the last hearing was on August 5, 1987. However, the final decree recites that the case came on for hearing on September 4, 1987. The decree itself is dated November 13, 1987.
The mother filed the motion to modify in question on January 5, 1988. A hearing was held on that petition on April 15, 1988. The following is an outline of the testimony at that hearing. The mother, with the child, was living in Poplar Bluff. She was employed as director of patient education at Lucy Lee Hospital in Poplar Bluff. The father was still living in Austin, Texas. He worked part-time as a research assistant and pursued graduate studies. He and his homosexual lover, Harry Reed, lived in an apartment. They kiss and hold hands. They sleep in the same bed. He and Reed perform oral sex on each other approximately once or twice each week. He states their relationship is "monogamous". He regards it as permanent. He probably would marry Reed if he were permitted to do so.
The father thinks that it is "best that she [the child] know who her father is and to know what her father is." He thinks that it is in the best interests of the child for the child to be in his home when he is living there with Reed. He believes it would be a healthy and broadening influence upon the child's upbringing and development to be exposed to the alternate lifestyle of he and Reed. He added, "It would allow her to see a broad spectrum, perhaps, of human interaction not just between heterosexual people, but also homosexual people." He would be adverse to having Reed leave the apartment when his daughter is visiting for the ten-day period, but he would agree to that if it is a condition. At the initial hearing in Texas, the father was asked the following questions:
Q. And that homosexual partner is important to you, undoubtedly.
A. Very much so.
Q. And in fact if Kay Marie visits you in Austin, this homosexual partner will be an important part in that visitation, I'm sure.
A. That's very true, yes. I want my lover to be able to share some time with Kay Marie also. I think he's got some important things that he can offer to her. We can demonstrate that we can love each other.
The only reason that he would prefer for his daughter to be heterosexual is because of the attitude of society toward homosexuality.
The father testified that pursuant to an interim order the child did visit in his home in Austin for ten days in October, 1987. During that time Reed continued to live in the apartment. When asked if Reed participated in the care and supervision of the child, the father answered: "In a supportive way." He then volunteered, "[H]e was never left alone with Kay Marie or anything." The transcript contains no suggestion that anyone aided the father and Mr. Reed in caring for the child.
When asked if during the ten-day period of visitation he and Reed engaged in any sexual contact, the father answered: "Nothing more than perhaps hand holding or kissing." They did sleep in the same bed. The child slept in another room.
When the child returned to Missouri, her mother noticed a change in the child.
In October when I received her back she had greatly changed her behavior such as I couldn't even leave the room, clinging behavior and before she has always been an independent type little girl. Couldn't even leave the room in the apartment, I could not get her to the bathroom, that was my first clue that there was something wrong; I could not get her in the bathroom and I could not get her in the bathtub to give her a bath and therefore, it made me assess her a little closer and I saw the labia was swollen
Later the mother examined the child using a lighted scope and saw a vaginal tear. The child was taken to a doctor. The mother strongly believes that the child's exposure to her father's homosexuality will be adverse to the child's development. She is vehemently opposed to unsupervised visitation by the father. She is also concerned *789 with the exposure of the child to AIDS. The father and an expert witness he presented did acknowledge the incidence of AIDS is higher in homosexuals than in the general population. The expert doubted that AIDS could be spread through casual contact. The expert added, "We have seen that more than 2,000 hospital workers have come into a considerable amount of contact of blood with people with AIDS through needle sticks, through cuts and of those 1,000 to 2,000 people that have been followed, only 12 of them have showed evidence of infection." The expert acknowledged that it is possible that a person infected with the AIDS virus to test negative.
The trial court made extensive findings of fact. Those findings include the following: The existence of and nature of the homosexual relationship between the father and Reed as outlined in the evidence recited. That Reed was present during the time the child was in Austin and offered supportive care. The child was aware of the fact the father and Reed slept together, "but no sexual activity was exhibited in her presence other than hand holding and kissing." That both the father and mother are aware of the fact that AIDS has a higher incidence of occurrence among homosexuals than the general public. Following the child being with the father, the mother noted changes in the child's behavior. The child was insecure and did not want the mother to leave the room. The child's vaginal area was swollen and a tear was observed.
The court then carefully analyzed the laws of this state concerning the award of custody of children to homosexual parents. It recognized and adopted the conclusions in the following quotation:
It is not our function to indite a revisionary preachment as to moral models. We do recognize that today we have changing standards of morality. Certain conduct once looked upon by society with opprobrium does not carry the social or private stigma it once did a few short years ago. Such conduct may even be socially `approved'. But private personal conduct by a parent which could well have an effect on children during the years in which their character, morality, virtues and values are being formed cannot be ignored or sanctioned by courts. Private conduct of a parent in the presence of a child or even under some other circumstances may well influence his or her young, impressionable life.... No matter how she or society views the private morality of the situation, we cannot ignore the influence her conduct may well have upon the future of this child and cannot give our judicial cachet to such conduct by etching in the law-books for all to read and follow. We see no salutary effect for the young child in exposing him to the mother's miasmatic moral standards.
L.H.Y. v. J.M.Y., 535 S.W.2d 304, 308 (Mo. App.1976).
The court then recognized § 452.410 which in part provides:
The court shall not modify a prior custody decree unless ... it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child. (emphasis added)
It determined the evidence did not establish a change of circumstances within the meaning of that section. For that reason, it concluded it could not alter the provisions of the Texas decree awarding the father possession of the child for ten days every other month. The circuit court then considered § 452.400.2. That subsection in relevant part provides: "The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair his emotional development." § 452.400.2. The court cited cases which hold that, in an action for modification, a change of circumstances is necessary to restrict visitation under § 452.400. See *790 Pulliam v. Sutton, supra. However, the circuit court determined to follow the cases that announce the following: "Overnight visits may be a part of `reasonable visitation rights' within the meaning of § 452.400 ... and thus not governed by the provisions of § 452.410 which require certain proof before `a prior custody decree' is modified." Keith v. Keith, 708 S.W.2d 350, 352 (Mo.App.1986) (citations omitted). Also see Blankenship v. Blankenship, 699 S.W.2d 44 (Mo.App.1985); L.L.T. v. P.A.T., supra; Adoption of E.N. and E.M.N., 559 S.W.2d 543 (Mo.App.1977). As stated, the father contends the circuit court erred because, in the absence of a finding of a change in circumstances, it was not authorized to restrict the ten-day periods of possession by the father.
Obviously the relationship between § 452.410 and § 452.400 is not settled. The applicable statutes are in apparent conflict. There is a distinction between "legal custody" and "physical custody". Legal custody carries with it determinations concerning the child's "upbringing". § 452.405. Also see § 452.375.1(1), (2). Joint physical custody is defined as "an order awarding each of the parents significant periods of time during which a child resides with or is under the care and supervision of each of the parents." § 452.375.1(2). Apparently, anything less than physical custody for an appreciable period of time may be regarded as "visitation". See Barry v. Barrale, 598 S.W.2d 574 (Mo.App.1980). This meaning is emphasized by § 452.400.1 which says that a parent not granted custody is entitled to reasonable visitation rights unless the court finds after a hearing that visitation would endanger the child's physical health or impair his emotional development. Section 452.400.2 expressly provides that "visitation rights" may be modified whenever such modification would serve the best interests of the child. These statutory provisions support the position taken by the circuit court and that expressed in Keith v. Keith, supra; Blankenship v. Blankenship, supra; and Adoption of E.N. and E.M.N., supra.
On the other hand, § 452.445 of the Uniform Child Custody Jurisdiction Act (§§ 452.440 to 452.550) includes the following definitions.
(1) `Custody determination' means a court decision and court orders and instructions providing for the custody of a child, including visitation rights....[1]
. . . .
(3) `Decree' or `custody decree' means a custody determination contained in a judicial decree or order made in a custody proceeding, and includes an initial decree and a modification decree; ....
§ 452.445(1) and (3) (emphasis added). By reason of the two definitions "decree" and "custody decree" include an award of visitation.
That Act also contains the following sections:
A custody decree rendered by a court of this state which had jurisdiction under section 452.450 binds all parties who have been served in this state or notified in accordance with section 452.460, or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made, unless and until that determination is modified pursuant to law, including the provisions of section 452.410 and sections 452.440 to 452.550.
§ 452.495. (emphasis added)
If a court of another state has made a custody decree, a court of this state shall not modify that decree unless it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with sections 452.440 to 452.550 or has declined to assume jurisdiction to modify the decree and the court of this state has jurisdiction.
§ 452.505.
The courts of this state shall recognize and enforce an initial or modification decree *791 of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with sections 452.440 to 452.550, or which was made under factual circumstances meeting the jurisdictional standards of sections 452.440 to 452.550, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of sections 452.440 to 452.550.
§ 452.500 (emphasis added). The provisions of § 452.410 have been noted. Sections 452.455, 452.460, 452.480 and 452.485 are also relevant. These sections support the view espoused by the father and adopted in Pulliam v. Sutton, supra. The relevant sections of the Uniform Child Custody Jurisdiction Act and the Dissolution of Marriage Act have not been construed and reconciled. However, it is not necessary to determine if the period of unrestricted ten-day visitation provided in the Texas decree may be modified in the absence in a change of circumstances referred to in § 452.410. The evidence does establish such a change in circumstances.
As stated, a decree awarding custody may be modified "upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child." § 452.410. It was no doubt to establish what facts were before the Texas court that the parties by stipulation placed in evidence transcripts of four hearings before that court. That evidence may also be considered as it bears upon the fitness of the parents. L.L.T. v. P.A.T., supra. "In addition, courts may permit evidence of predecree facts if relevant to understanding the significance of the new facts." Haralambie, Handling Child Custody Cases § 7.05 (1983). Those transcripts reveal that a series of four different judges conducted hearings that culminated in the final decree.
After an initial hearing, the court appointed a guardian ad litem for the child. The guardian ad litem was a social worker and certified counselor. At a subsequent hearing, the guardian ad litem reported that she had investigated the circumstances of the father. She testified, "basically, the information that I have gotten from the people that I have talked to, is that Paul is an extremely conscientious, responsible, loving and caring person." She was asked, "And do you have any concerns about Harry's ability to focus on Kay Marie, and to make her needs of primary importance?" (emphasis added) Her answer included,
No. We spoke about it. I asked him particularly how he felt about being around a child for an extended period of time. And it seems as though he spent most of his childhood with his younger cousins. He's the youngest of four or five kids. And so he spent a lot of time taking care of his cousins, and there were kids around all the time.
She recommended that the father have possessory custody of the baby for unsupervised visitation in Austin for ten days each two months. This recommendation was ultimately adopted by the Texas court.
Cross-examination established the extent of the examination that formed the basis for the Texas decree. The guardian ad litem talked with the father and Harry Reed. She also talked with David Kramer, a psychologist, and Dolores Sands, the father's supervisor, and the father's parents. With the exception of the father and Reed, the investigation was conducted by telephone. Kramer is a psychologist who tested the father and found him to be well adjusted. Kramer had nine or ten weekly psychotherapy sessions with a group of homosexuals that included the father. The guardian ad litem relied a great deal upon what she was told by Kramer. She did not know that Kramer was a homosexual.
The principles of law of this state which control the disposition of this appeal are well established. They are reflected in the decisions of many other states. Those principles have been developed and declared in the cases that are hereafter cited. The following is an appropriate summary.

*792 Actually, given its concern for perpetuating the values associated with conventional marriage and the family as the basic unit of society, the state has a substantial interest in viewing homosexuality as errant sexual behavior which threatens the social fabric, and in endeavoring to protect minors from being influenced by those who advocate homosexual lifestyles.
Roberts v. Roberts, 22 Ohio App.3d 127, 489 N.E.2d 1067, 1070 (1985). The interest of the state is demonstrated by the fact public policy demands that evidence of communications by a spouse concerning his or her homosexual activity is admissible as an exception to the confidentiality of inter-spousal communications provided by § 491.020 where the welfare of a child is concerned. T.C.H. v. K.M.H., 693 S.W.2d 802 (Mo. banc 1985).
A statute of this state declares that deviate sexual intercourse with another person of the same sex is illegal. § 566.090.1. In upholding a similar statute, the Supreme Court of the United States made the following observations: "It is obvious to us that neither of these formulations would extend a fundamental right to homosexuals to engage in acts of consensual sodomy. Proscriptions against that conduct have ancient roots." Bowers v. Hardwick, 478 U.S. 186, 192, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140, 146-147 (1986). "The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed." Id., 478 U.S. at 196, 106 S.Ct. at 2846, 92 L.Ed.2d at 149.
The governing factor in determining custody is not the wishes or the best interests of a parent. "[B]oth the trial court and this court are bound by the one `... inflexible and unyielding principle ... that the welfare of the child ... is paramount and supreme....'" C_____ C_____ v. J_____ A_____ C_____, 499 S.W.2d 809, 811 (Mo.App.1973).
It is appropriate to acknowledge that some states hold that the influence of homosexual behavior is a basis for restricting or denying visitation only when such an influence has adversely affected or is likely to affect the child in question. S.N.E. v. R.L.B., 699 P.2d 875 (Alaska 1985); Stroman v. Williams, 291 S.C. 376, 353 S.E.2d 704 (App.1987); Matter of Marriage of Cabalquinto, 43 Wash.App. 518, 718 P.2d 7 (1986). A determination that exposure to such behavior has not had or will not have such an adverse effect is often based upon the absence of expert testimony to establish such an effect. S.N.E. v. R.L.B., supra; Doe v. Doe, 16 Mass.App. 499, 452 N.E.2d 293 (1983); Gottlieb v. Gottlieb, 180 A.D.2d 120, 488 N.Y.S.2d 180 (1985).
That is not the law in this state. The law in this state has been appropriately summarized.
Appellant Kathy stresses Dr. Buchanan's testimony that the child at this timeage 10shows no ill effects from her present environment. Dr. Buchanan finds the child to be normal and well adjusted. The court does not need to wait, though, till the damage is done. If the child's situation is such that damage is likely to occur as her sexual awareness develops with the approach of young womanhood, the court may in a proper case remove her from the unwholesome environment.
N.K.M. v. L.E.M., 606 S.W.2d 179, 186 (Mo. App.1980).
This court finds that Holly was more than likely to suffer from living in the unwholesome environment in which she has been cast. Because the court misapplied the law by holding that demonstrated damage to Holly was required to change custody, the judgment is reversed.
M.L.G. v. J.E.G., 671 S.W.2d 312, 316 (Mo. App.1984).
Private personal conduct by a parent which could well have an effect on children during the years in which their character, morality, virtues and values are being formed cannot be ignored or sanctioned by courts.
L.H.Y. v. J.M.Y., supra, at 308. That doctrine has been consistently followed. In re Marriage of P.I.M., 665 S.W.2d 670 (Mo. *793 App.1984); Mansell v. Mansell, 583 S.W.2d 284 (Mo.App.1979).
Moreover, it is established that expert testimony is not a necessary basis for a determination that exposure to a homosexual influence will adversely affect a child. "In any event, the father's acknowledgement that he was living with an avowed homosexual certainly augurs for potential harm to the child that the trial court was perfectly competent to assess." J.L.P.(H.) v. D.J.P., 643 S.W.2d 865, 869 (Mo.App.1982) (emphasis added). "Wife, as well as the American Civil Liberties Union (A.C.L.U.), cite articles that indicate there are no significant differences among heterosexual parents and homosexual divorced parents and their children. Of course, the trial court has the authority to find the evidence presented not credible." S.E.G. v. R.A.G., 735 S.W.2d 164, 166 (Mo.App.1987) (footnote omitted). "This court agrees with the observation in S.E.G. [v. R.A.G., 735 S.W.2d 164 (Mo.App.1987) ] that a court cannot ignore the effect which the sexual conduct of a parent may have on a child's moral development." G.A. v. D.A., 745 S.W.2d 726, 728 (Mo.App.1987).
That principle is recognized in many states as illustrated by the following cases. "The father's continuous exposure of the child to his immoral and illicit relationship renders him an unfit and improper custodian as a matter of law." Roe v. Roe, 228 Va. 722, 324 S.E.2d 691, 694 (1985).
We also find, as discussed above, that there are sufficient social, moral and legal distinctions between the traditional heterosexual family relationship and illicit homosexual relationship to raise the presumption of regularity in favor of the licit, when established, shifting to the illicit, the burden of disproving detriment to the children.

Constant A. v. Paul C.A., 344 Pa.Super. 49, 496 A.2d 1, 10 (1985) (emphasis added). Also see S v. S, 608 S.W.2d 64 (Ky.App. 1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); Jacobson v. Jacobson, 314 N.W.2d 78 (N.D.1981).
It is a corollary rule that sexual abuse need not be established by direct evidence. "Common experience teaches us a sexual offense can cause behavioral and personality changes in the complainant." State v. Burke, 719 S.W.2d 887, 890 (Mo.App.1986). Also see L.L.T. v. P.A.T., supra.
Upon the basis of these principles, circumstances have been consistently found to require that a child not be placed or remain in the custody of a homosexual parent and that visitation of a homosexual parent be restricted or terminated. "The trial court's findings thus present a factual premise that the child's physical or emotional welfare is threatened by the activities and conduct of the father, which affords a sufficient basis for the trial court to restrict the visitation of the father pursuant to § 452.400.2 RSMo 1978." J.L. P.(H.) v. D.J.P., supra, at 869. This doctrine has been followed in denying overnight visitation. In re J.S. & C., 129 N.J. Super. 486, 324 A.2d 90 (1974). The doctrine is consistently applied. Pulliam v. Sutton, supra; J.L.P.(H.) v. D.J.P., supra; Bull v. Bull, 634 S.W.2d 228 (Mo.App. 1982); Barry v. Barrale, supra; Daus v. Daus, 595 S.W.2d 19 (Mo.App.1979); L.H.Y. v. J.M.Y., supra; Gottlieb v. Gottlieb, supra; In re J.S. & C., supra; Annot., VisitationsHomosexual or Lesbian Parent, 36 A.L.R.4th 997 (1985). It has also been followed in requiring visitation in the presence of third parties. Daus v. Daus, supra; Roberts v. Roberts, supra. Living with a homosexual lover provides the basis for a change of custody. N.K.M. v. L.E.M., supra.
The father testified that Reed provided supportive care of the child. The circuit court found the father and Reed held hands and kissed in the child's presence. The circuit court found that when the child returned from visitation in Austin, the child's behavior had changed and her vaginal area was swollen and a tear was observed. These findings are supported by the evidence. Those facts have arisen since the decree in Texas. When considered in conjunction with the other evidence properly before the court, they are a basis for the modification of the Texas decree. N.K.M. v. L.E.M., supra. They *794 clearly support the conclusion of the circuit court that the best interests of the child demand restrictions upon visitation by the father. It is apparent that had the trial court determined the existence of changed circumstances within the meaning of § 452.410, it would have imposed more stringent restrictions upon visitation by the father. The factors in this case are much like those in Roberts. In that case the trial court restricted a father's visitation to the Columbus area only and provided that the defendant was prohibited from having any unrelated male present during such visitation. The appellate court found that such restrictions were inadequate. It remanded the cause with the following directions.
In view of the testimony by one of the psychologists that visitation would not be harmful if the children could be shielded from the knowledge that their father is a homosexual, we are unable to say that the trial court was required to terminate visitation. However, the trial court abused its discretion by failing to impose conditions upon defendant's exercise of visitation, which would protect the welfare and best interests of the children. Upon remand, the trial court may conclude that it is unable to devise adequate safeguards, in which event its only alternative will be to terminate visitation until the children attain such an age that they will not be harmed or influenced by learning of their father's homosexuality. Should the trial court conclude that adequate safeguards are available, it would appear that they should, at a minimum, include the limitations appearing in the order appealed from, together with the added requirements that defendant not reveal his lifestyle to the children, and that visitation take place in plaintiff's presence, or under other sufficiently controlled circumstances.
Roberts v. Roberts, supra, 489 N.E.2d at 1070.
So it is in this case. The father is an avowed and practicing homosexual who believes that it is in the best interests of the child that she be exposed to such activity. He believes that his homosexual lover should participate in the child's development. The father and his homosexual lover have displayed homosexual activities by holding hands and kissing in the child's presence. The condition of the child when returned from visitation in their apartment has been noted. It is found that unrestricted visitation by the father would endanger the child's mental health and emotional development. S.E.G. v. R.A.G., supra; L. v. D., 630 S.W.2d 240 (Mo.App.1982); L.L.T. v. P.A.T., supra; J.L.P.(H.) v. D.J.P., supra. It is further determined that visitation by the father must be supervised visitation in the presence of a responsible adult. Further, supervised overnight visitation and supervised visitation for such extended periods of ten days is impractical.
It is the duty of this court, if possible, to dispose of the case. Rule 84.14. The judgment of the trial court upon Count I and upon Count III of the mother's motion is affirmed. The judgment of the trial court upon Count II modifying the custody provisions of the Texas decree is reversed. The Texas decree is modified by eliminating therefrom the provisions for temporary custody or visitation by the father. The record contains no information concerning the frequency, duration and place of practical, appropriate periodic supervised visitation of the child by the father with a minimum of disruption for the child. Nor does it contain any information concerning what appropriate supervision is available. The trial court may determine that, in view of the age of the child, it would be impractical to provide for such supervised visitation in Austin. The cause is remanded for the sole purpose of the circuit court hearing evidence on those issues and further modifying the custody decree by making appropriate provision for such periodic supervised visitation by the father.
FLANIGAN, P.J., concurs.
PREWITT, J., dissents and files dissenting opinion.
HOGAN, J., not participating.
PREWITT, Judge, dissenting.
I respectfully dissent. The trial court made extensive and carefully considered *795 findings of fact and conclusions of law, fifteen pages in length, and reached a practical and reasonable disposition of this matter. I do not believe it abused the discretion it has in child custody and visitation matters.
As I read the majority opinion, no homosexual parent should ever have unsupervised custody of his child even for a relatively short period. This is the type of generalization that courts should not make, although that appears to occur in this type of custody matter. See G.A. v. D.A., 745 S.W.2d 726, 728 (Mo.App.1987) (Lowenstein, J., dissenting).
Each custody case, whether a parent is homosexual, is different and should be determined on its own facts. There is no indication that the child would be harmed by spending, without supervision, the limited time with her father that the trial court provided. There was no evidence that the father had ever physically harmed his daughter or allowed it to happen. The mother makes no such contention and her testimony regarding the swelling and tear in the vaginal area of the child is not even mentioned in the mother's brief.
Nor is there evidence of emotional harm now or in the future. The mother testified to "clinging behavior" of the child after she returned from visitation with the father but that alone does not indicate anything improper occurred to her or that she should not continue to see him. Cf. Shepherd v. Shepherd, 719 S.W.2d 115, 116 (Mo.App. 1986).
The father here was not a "gay activist" who advocated such behavior, as was the father of a young boy in J.L.P.(H.) v. D.J.P., 643 S.W.2d 865 (Mo.App.1982). The trial court found, without dispute at trial or here, that the father did not frequent gay bars and has not participated in any group organization relating to homosexual activities. He preferred for his daughter to be heterosexual "because of society". He acknowledged "the burden his lifestyle may place on the child." He does not exhibit his relationship with Mr. Reed in public.
It is important for the child to know her father and receive the guidance, love, and companionship which the record indicates he was willing to provide. He agreed to comply with the restrictions set by the trial court and we should not assume that he will violate them.
The trial judge was in a position to view and listen to the parties and hear the other evidence firsthand and we should defer to his ruling. The limitations which the principal opinion suggests would be hardly any visitation at all and may result in the father never or rarely seeing the child. I believe that would be a serious mistake in providing for the child's welfare. I would affirm the judgment.
NOTES
[1] This definition is substantially the same as that found in 28 U.S.C.S. § 1738A(b)(3).