Bryn Douglas **MARLOW,**
**Appellant–Petitioner,**

v.

Constance Jane **MARLOW,**
**Appellee–Respondent.**

No. 48A02–9803–CV–211.

Court of Appeals of Indiana.

Nov. 25, 1998.

---

Sean C. Lemieux, Indiana Civil Liberties Union, Indianapolis, for appellant-petitioner.

Christopher A. Cage, Michael C. Lacey, Hulse Lacey Hardacre Austin & Shine, P.C., Anderson, for appellee-respondent.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Bryn Douglas Marlow appeals that portion of his marriage dissolution decree pertaining to restrictions placed upon his visitation with his three children.

We affirm.

### ISSUE

1. Whether there is a rational basis to support the visitation restrictions.

2. Whether the restrictions are unconstitutional.

### FACTS

Douglas and Connie Marlow were married in 1983. They adopted three children during the course of their marriage. The oldest child, Caleb, was eight years-old at the time of the dissolution proceeding. The youngest children, Jacob and Isaac, were both five years-old. Douglas and Connie were both raised in conservative, fundamentalist Christian environments, and believed that homosexuality was a sin. They taught and raised their children in this environment as well.

Before their marriage, Douglas told Connie that he had previously been attracted to another man. Douglas further explained that he thought "this was a phase that most guys went through, that it was over." (R. 204). However, during the course of their marriage, Douglas continued to be attracted to men, and he and Connie attended counseling throughout the years in an attempt to save their marriage. In April 1995, Douglas told Connie that he could no longer ignore the issue of his sexuality.

In November 1995, Douglas and Connie separated and Douglas, then able to reconcile his homosexuality with his conservative Christian background, began attending conferences on homosexuality in such places as Canada, California, New Mexico and Colora-

do. In February 1996, Douglas changed his name to Bryn Douglas Jay Rikala Urko Corinth North Marlow (hereafter "Bryn"), each part of the name reflecting a part of Bryn's perceived new identity, personality, ancestry and culture. Also in February 1996, Bryn filed a petition for dissolution of marriage.

During the pendency of the dissolution proceeding, Bryn exercised regular visitation with his three children. Connie had allowed Bryn to exercise overnight visitation with the boys so long as no other adults were present. However, she subsequently learned that although he did not allow visitors to sleep in the apartment while his boys were spending the night, Bryn had the visitors sleep in the hallway of the apartment or in the car.

The trial court held hearings on the dissolution petition in August and November 1996 and in March and June 1997. Bryn, Connie, Counselor Daniel Wilkinson, Clinical Psychologist Garrett Higbee, Bryn's brother psychologist Stephen Marlow, family friend Annetta McKaig, and Clinical Psychologist Leesa Nite all testified at the hearings. The trial court took the matter under advisement and issued a dissolution order on January 26, 1998, wherein it awarded sole custody of the boys to Connie. The order also included the following visitation restrictions:

1. Pending further order of this court, during periods of overnight visitation, the Petitioner-father shall not have any other non-blood related person in the house overnight when the children of the parties are present.

2. Petitioner-father shall not include in the children's activities during periods of visitation, any social, religious or educational functions sponsored by or which otherwise promote the homosexual lifestyle.

## DECISION

### I. Rational Basis for the Restrictions

Bryn now appeals the restrictions placed upon his visitation with his children. Specifically, he first contends as follows:

Because nothing in the record warranted these restrictions, or any restriction, and because the father's sexual orientation and

(Connie's) opinions regarding it do not support a limit of parent's general right to unrestricted visitation, the bans imposed by the trial court on Father's visitation should be removed.

Bryn's Brief, p. 13. We disagree.

In all visitation controversies, courts are required to give foremost consideration to the best interests of the child. Ind.Code 31–17–4–2; Pennington v. Pennington, 596 N.E.2d 305, 306 (Ind.Ct.App. 1992), trans. denied. When reviewing the trial court's resolution of the visitation issue, we reverse only when the trial court manifestly abused its discretion. Id. If the record reveals a rational basis supporting the trial court's determination, no abuse of discretion occurred. Id. We will not reweigh evidence or reassess the credibility of witnesses. Id.

In Pennington, wherein we affirmed a restriction prohibiting the father's male friend from being present during the father's overnight visitation with his seven year-old son, we noted that it is "not puritanical or unreasonable to attempt to shield a child of tender age ... from the sexual practices of the visiting parent, whether those practices are homosexual ... or heterosexual." Id. Such protection is a sound practice designed to foster the child's emotional well-being and is widely employed. Id. and cases cited therein. See also Annotation, Visitation Rights of Homosexual or Lesbian Parent, 36 A.L.R.4th 997 (1985); Propriety of Provision of Custody or Visitation Order Designed to Insulate Child from Parent's Extramarital Sexual Relationships, 40 A.L.R.4th 812 (1985).

Here, testimony at the four days of dissolution hearings reveals that Bryn and Connie were both raised in conservative, fundamentalist Christian environments and believed that homosexuality was a sin. They both taught and raised their children in this environment as well. When the children were eight years-old and five years-old, Bryn, then able to reconcile his homosexuality with his conservative Christian background, changed his name and filed a petition for dissolution of marriage.

During the pendency of the dissolution proceedings, Bryn took the children to a "Liberty and Justice for All" conference sponsored by, among others, PFLAG (Parents and Friends of Lesbian and Gay Persons). The conference was a "day-long workshop addressing the concerns of gay-lesbian people as that relates to religion, education and the political arena." (R. 266). Bryn "shared [his] story" at the conference. (R. 266).

Bryn also took the children to a lesbian choir and to a baptismal service on the White River. Bryn explained the service as follows:

> Rev. Delaqua came out as a gay man. His family wrote him out, refused to talk to him. For himself, he chose the name Delaqua as his last name, or the cross, David of the cross. And then at this, at this ceremony it was important for him to mark himself to say this is the name I've chosen for myself, to say that my family has cast me off, but, quoting from the Psalms, "God has taken me in."

(R. 299).

After visits with Bryn, the boys exhibited behavior consistent with emotional distress such as bed-wetting, difficulty sleeping, nightmares and general malaise. At the time of the hearing, Bryn was living with his male partner in a one-bedroom apartment where the two men slept in the same bed. Clinical Psychologist Garrett Higbee testified that in his opinion, Bryn's detailed discussions with the boys regarding homosexuality were not appropriate for the boys because they lack the cognitive ability to fully understand the information. According to Dr. Higbee, the appropriate age to deal with sexual issues is early adolescence. Dr. Higbee recommended that the court award sole custody of the boys to Connie and that Bryn not be allowed to exercise overnight visitation with the boys.

Counselor Daniel Wilkinson, an expert witness in custody cases, testified that the children are confused about Bryn's new lifestyle after both Bryn and Connie taught and raised them in a conservative Christian environment. For example, five year-old Jacob fluctuates between wanting to change his name and be "gay," (R. 335), and telling his father that he's "done the wrong thing." (R. 336). Caleb knows that his father is a homosexual and he is uncomfortable when Bryn attends church functions because he knows his father's homosexuality is inconsistent with the church's beliefs. Wilkinson recommended that the court award sole custody of the boys to Connie and that Bryn not be allowed to exercise overnight visitation with the boys. Wilkinson also recommended limiting the children's exposure to "expression of the homosexual lifestyle." (R. 341).

Based upon the foregoing, the record reveals a rational basis supporting the trial court's visitation restrictions. We further note that although both Higbee and Wilkinson recommended that Bryn not be allowed to exercise overnight visitation with the boys, the trial court did not follow these recommendations. Rather, the trial court allowed Bryn to exercise visitation with the boys so long as there are no other non-blood related persons in the house overnight when the children are present. We cannot say that the trial court abused its discretion in imposing the restrictions. *See Pennington.*

## II. *Constitutionality of the Restrictions*

Bryn further contends that the visitation restrictions are unconstitutional. First, he contends that the restrictions are based on a private bias and therefore violate his constitutional right to equal protection. In support of his proposition, he directs us to *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984).

In *Palmore,* Linda Palmore and Anthony Sidoti, both Caucasians, were divorced in May 1980, and Linda was awarded custody of their three year-old daughter. Anthony subsequently sought custody of the child because Linda was cohabiting with an African–American man that she subsequently married. After hearing evidence and concluding that there was "no issue as to either party's devotion to the child, adequacy of housing facilities, or respectability of the spouse of either parent," the trial court awarded custody of the child to Anthony. 466 U.S. at 432, 104 S.Ct. at 1881. In support of its decision, the court explained as follows:

This Court feels that despite the strides that have been made in bettering relations between the races in this country, it is inevitable that Melanie will, if allowed to remain in her present situation and attains school age and thus more vulnerable to peer pressures, suffer from the social stigmatization that is sure to come.

*Id.*

Linda appealed, and after reviewing the record, the United States Supreme Court found that the trial court had "made no effort to place its holding on any ground other than race." *Id.* According to the appellate court, the trial court's foremost consideration should have been the best interests of the child, not "private biases and the possible injury they might inflict...." 466 U.S. at 432, 104 S.Ct. at 1882. The Supreme Court therefore reversed the trial court's decision awarding custody to Anthony.

Here, Bryn attempts to analogize the facts of his case to those in *Palmore* by arguing that the trial court restricted his visitation with his children because of a private bias relating to Bryn's homosexuality. Specifically, Bryn posits that the "law is clear: visitation restrictions based on bias and prejudice are incompatible with the concept of equal protection and must be vacated." Bryn's Brief, p. 23.

■ However, our review of the record, including the dissolution decree, reveals that the trial court's foremost consideration in this case was the children's best interests, not Bryn's homosexuality. For example, the trial court noted in the dissolution decree that "this case centered very clearly on the children of the marriage and their best interests." (R. 148). The dissolution decree further provides as follows:

The record further discloses through the Petitioner-father's testimony, a specific intent by him to orient the children to the gay lifestyle ... by taking them to gay religious services and ceremonies, gay social events and gay artistic performances. The Court finds that the children are in need of a balanced environment both physically and emotionally stable, and one in which they can find safe retreat from a complex world. The children are also in need of both their mother and their father.... The Court finds clear evidence that the Petitioner-father is over-emphasizing the issue of homosexuality with the children. The Court finds that it [is] in the children's best interest that the issue of sexuality and the discussion thereof should be delayed until each child reaches adolescence.

(R. 152–53).

We further note that during the dissolution hearing, the trial court questioned the parties' expert witnesses regarding the children's best interests. Clearly, the facts of this case are distinguishable from those in *Palmore* because the visitation restrictions were not based on a private bias. Rather, the restrictions were based on the children's best interests. Bryn's argument is therefore without merit.

■ Bryn also argues that the restriction which prohibits him from taking the children to activities sponsored by or which otherwise promote the homosexual lifestyle is unconstitutionally vague and over broad. Although this argument has not been addressed in any Indiana cases, our review of case law from other jurisdictions reveals that the Missouri Court of Appeals addressed a similar argument in *J.L.P.(H.) v. D.J.P.*, 643 S.W.2d 865 (Mo.Ct.App.1982). There, the father argued that a restriction which prohibited him from taking his son to "gay activist social gatherings" was vague, over broad and a prior restraint under the first amendment. *Id.* at 871. The appellate court noted that the trial court had not attempted to "dictate to the father with respect to any facet of his lifestyle, attendance at church, or rights of speech." *Id.* Rather, the trial court simply required that the father exercise his visitation rights without exposing his child to persons who "promote the practice of homosexuality ... and restrict the child's attendance at a church which supports the practice of homosexuality to the extent that it recognizes a 'holy union' between homosexuals as the equivalent of marriage." *Id.*

The Missouri Court of Appeals found that the record in the case was "sufficient to authorize the restrictions" upon the father's

visitation rights and that the father's arguments were therefore without merit. Here, as in *J.L.P.*, we have already determined that the record is sufficient to authorize the visitation restrictions which were based on the children's best interests. Further, we cannot say that the restrictions are vague and over broad. Bryn's arguments must therefore fail.

### CONCLUSION

The granting of visitation is within the sound discretion of the trial court. *Pennington*, 596 N.E.2d at 306. Here, the evidence is undisputed that subsequent to the parties' separation, Bryn changed his lifestyle. The evidence is also undisputed that Bryn's new lifestyle has had an adverse impact on his young children who lack the cognitive ability to reconcile it with their conservative upbringing. The trial court has not permanently precluded Bryn from teaching his children about his lifestyle. Rather, the trial court found that at the present time, it is in the children's best interests that the issue of sexuality and the discussion thereof should be delayed until each child reaches adolescence and has the cognitive ability to understand the information and reconcile it with their conservative upbringing and the past teachings of their parents and church.

Our ruling in this case is consistent with other cases wherein the trial court has placed visitation restrictions upon the noncustodial parent. *See Pennington* and cases cited therein. Here, as in those cases, the facts and circumstances support the trial court's decision, and we find no abuse of the court's discretion.

Affirmed.

BAKER and BAILEY, JJ., concur.