In re: The Paternity of G.R.G.,

Robert A. Gregory II, Appellant–
Respondent.

v.

Denise K. Manning, Appellee–
Petitioner.

No. 32A05–0412–JV–649.

Court of Appeals of Indiana.

June 10, 2005.

Denise F. Hayden, Indianapolis, for Appellant.

William O. Harrington, Scott C. Quick, William O. Harrington, P.C., Danville, for Appellee.

## OPINION

MAY, Judge.

Robert A. Gregory ("Father") appeals from the trial court's order in the paternity action filed by Denise K. Manning ("Mother"). Father raises six issues, which we restate as:

1. Whether the trial court properly determined Father's gross income in computing his child support obligation;

2. Whether the trial court erred in finding Father has a child support arrearage;

3. Whether the trial court erred in ordering Mother and Father communicate only in writing absent an emergency;

4. Whether the trial court erred in ordering that Father may not obtain school and medical records for G.R.G. directly from the school and medical provider;

5. Whether the trial court erred in entering the parenting time order; and

6. Whether the trial court's order that Mother and Father are forever restrained from discussing their disputes with G.R.G. amounts to an unconstitutional prior restraint on Father's free speech.

We affirm.

## FACTS [1] AND PROCEDURAL HISTORY

Mother and Father are parents of G.R.G., a child born out-of-wedlock on September 9, 1995. Paternity was established on September 15, 1999. Mother has both legal and physical custody of G.R.G. and Father has parenting time.

On May 14, 2004, Mother filed a motion to modify the paternity order as to Father's parenting time and child support. Pursuant to Mother's motion, the trial court appointed a guardian *ad litem* who issued a report and recommendations.

## DISCUSSION AND DECISION

 The trial court entered findings and conclusions. Thus, we apply a two-tiered standard of review: we determine first whether the evidence supports the findings and, second, whether the findings support the judgment. *Turner v. Turner,* 785 N.E.2d 259, 263 (Ind.Ct.App.2003), *trans. denied.* We disturb the judgment only where there is no evidence supporting the findings, or the findings fail to support the judgment. *Id.* We do not reweigh the evidence and we consider only the evidence favorable to the trial court's judgment. *Id.* A challenger, here Father, must establish the trial court's findings are clearly erroneous. *Id.* Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. *Id.* However, we do not defer to conclusions of law, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.*

### 1. *Weekly Gross Income*

 The trial court's calculation of Father's weekly gross income for child support purposes was not clearly erroneous. Our supreme court has placed a strong emphasis on trial court discretion in determining child support obligations and has acknowledged the principle that child support modifications will not be set aside

---

1. Father's Statement of Facts does not comply with Ind. Appellate Rule 46(A)(6). A Statement of Facts should be a concise narrative of the facts stated in the light most favorable to the judgment. *Nehi Beverage Co., of Indianapolis v. Petri,* 537 N.E.2d 78, 82 (Ind. Ct.App.1989), *trans. denied.* Father's Statement of Facts contains argument, in violation of the appellate rules. *See Parks v. Madison County,* 783 N.E.2d 711, 717 (Ind.Ct.App. 2002) (statement of facts is to be a narrative and is not to be argumentative).

unless they are clearly erroneous. *Lea v. Lea*, 691 N.E.2d 1214, 1217 (Ind.1998).

The court ordered Father to pay $133.80 per week. Father asserts the trial court erred in calculating the support obligation because it "adopted a figure calculated by the Mother which was an average of [Father's] 2002, 2003, 2004 year-to-date incomes." (Appellant's Br. at 10.) Father maintains the ending date the trial court used in averaging his 2004 income figure was August 31, 2004. He asserts the court's 2004 income figure is inaccurate because from January through August of 2004 [2] he worked a large number of mandatory overtime hours. Father testified he would no longer receive overtime hours. Therefore, he maintains, "by using the averaged weekly income figure, [his] child support obligation becomes inflated and onerous." (*Id.*)

The Indiana Child Support Guidelines aid in the determination of the amount of child support that should be awarded and provide a measure for calculating each parent's share of the child support. *Lea*, 691 N.E.2d at 1217. "There is a rebuttable presumption that the amount of the award which would result from the application of the Indiana Child Support Guidelines is the correct amount of child support to be awarded." *Id.*

When fashioning a child support order, the trial court's first task is to determine the weekly gross income of each parent. *Scott v. Scott*, 668 N.E.2d 691, 695–696 (Ind.Ct.App.1996). "Weekly gross income" is broadly defined to include not only actual income from employment but also potential income and imputed income from "in-kind" benefits. *Glover v. Torrence*, 723 N.E.2d 924, 936 (Ind.Ct.App.

2000). Indiana Child Support Guideline 3(A) provides, in pertinent part:

> Weekly gross income of each parent includes income from any source, . . . and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, prizes, and alimony or maintenance received from other marriages.

While the Guidelines advocate a total income approach to calculating weekly gross income, they recognize determining income is fact-sensitive when irregular income, such as bonuses, overtime, and commissions, is involved. *In re A.J.R.*, 702 N.E.2d 355, 359 (Ind.Ct.App.1998). The commentary to Guideline 3(A) provides:

> There are numerous forms of income that are irregular or nonguaranteed, which cause difficulty in accurately determining the gross income of a party. Overtime, commissions, bonuses, periodic partnership distributions, voluntary extra work and extra hours worked by a professional are all illustrations, but far from an all-inclusive list, of such items. Each is includable in the total income approach taken by the Guidelines, but each is also very fact-sensitive.

The Guidelines provide for a child support worksheet to be completed and filed with the trial court, signed by the parties and supported by documentation. Child Supp. G. 3(B). If the parties cannot agree on the weekly gross income figures to be included on the worksheet, then each

---

2. Father maintains the ending date the trial court used in averaging his 2004 income figure was August 31, 2004. The correct date is August 7, 2004. (*See* Appellant's App. at 34.)

party may submit its own worksheet and documentation, from which the trial court can determine the parties' respective weekly gross incomes and compute the appropriate child support amount. Child Supp. G. 3(B), cmt. 1. Each party bears the burden of justifying the incomes used in his or her own worksheet.

Mother and Father each submitted child support obligation worksheets to assist the trial court in calculating their weekly gross incomes. Mother stated Father's income was $1,377.00 per week and she requested $156.98 per week in child support. Father proposed the trial court find his weekly gross income was $945.23, so his child support obligation would be $108.00.

One method of treating irregular income is to require the obligor to pay a fixed percentage of the irregular income "in child support on a periodic but predetermined basis (weekly, bi-weekly, monthly, quarterly) rather than by the process of determining the average of the irregular income by past history and including it in the obligor's gross income calculation." Child Supp. G. 3(A), cmt. 2(b). Father invites us to remand this matter to the trial court "with instructions to determine [his] base income for purposes of calculating child support" (Appellant's Br. at 11), and asserts "the trial court should determine an appropriate percentage, if any, Father should pay of any irregular income he may receive." (*Id.*)

The trial court found Father's weekly gross income to be $1,170.00 based on Father's average income for a three-year period. (*See* Appellant's App. at 34.) The trial court took into account Father's income through August 7, 2004, which at that juncture, amounted to thirty-one weeks.

However, it does not follow, as asserted by Father, that income averaging cannot be used when an obligor's income, other than from self-employment, is subject to fluctuation. *See Lloyd v. Lloyd,* 755 N.E.2d 1165, 1170 (Ind.Ct.App.2001). Should Father's income hereafter diminish such that the current child support order becomes unreasonable, he is free to petition the trial court to modify the same. *See* Child Supp. G. 4, cmt. Therefore, we cannot say the trial court's calculation of Father's weekly gross income was clearly erroneous. *See, e.g., Lea,* 691 N.E.2d at 1217 (noting a rebuttable presumption that the amount of the award that would result from the application of the Indiana Child Support Guidelines is the correct amount of child support to be awarded); *Railing v. Hawkins,* 746 N.E.2d 980, 982 (Ind.Ct. App.2001) (holding when a trial court determines it is not appropriate to include overtime income in the determination of a parent's child support obligation, the trial court should express its reasons). Accordingly, we affirm the trial court's calculation of Father's weekly gross income for child support purposes.

### 2. *Child Support Arrearage*

█ Father argues the trial court erred in ordering him to satisfy a child support arrearage. Father maintains there was no assertion during the hearing he was delinquent in the payment of any child support nor had Mother filed any action for the enforcement or collection of child support.

The trial court's order stated Father "shall pay an additional Twenty–Seven Dollars ($27.00) per week on the arrearage accumulated since the date of the filing of the case on 17 May, 2004, until the arrearage is satisfied." (Appellant's App. at 21.) Mother's counsel, in her opening statement, mentioned the arrearage the trial court addressed in its order:

There is also an issue with respect to child support. Back when the decree

was entered the child support was set at ninety dollars per week. Uh, Mr. Gregory is current, or if not current, very, very close to current on his child support, but there has been a change in the incomes and, of course, a change in the way we calculate child support since Nineteen Ninety-nine. And we believe the evidence will support a modification of the child support order from ninety dollars a week to a hundred and fifty-seven dollars per week. And we'll be asking The Court to make that retroactive to the date of filing, May Fourteen, Two Thousand Four, which will establish an arrearage of roughly sixteen hundred dollars[.]

(Tr. at 6–7.)

Mother also testified at the hearing regarding the arrearage:

Q And so whether The Court adopted, whichever of your calculations The Court might adopt is more than a twenty percent increase over the ninety dollars per week that is currently owed by Mr. Gregory, is that right?

A Yes.

Q Okay. And are you asking The Court to make the new child support calculation retroactive to the date of the filing of your petition on May Fourteen, Two Thousand Four?

A Yes.

Q Why do you think that would be fair?

A Because it's what he probably should have been paying a long time ago.

Q Okay. And did we do a calculation that as of last Friday it has been twenty-four weeks since you filed your petition?

A Yes.

Q And if The Court adopts your proposal of a hundred and fifty-seven a week, uh, times twenty-four weeks,

the difference between what he [sic] currently paying and what he would be paying is uh sixty-seven dollars a week is that right?

A Yes.

Q And if we take sixty-seven dollars a week times twenty-four weeks do we come up with sixteen hundred and eight dollars?

A Yes.

(*Id.* at 68–69.)

■ A trial court may order support retroactive to any date after the filing of the petition to modify support. *See Haley v. Haley*, 771 N.E.2d 743, 753 (Ind.Ct.App. 2002). Therefore, the trial court did not abuse its discretion in ordering Father to pay additional weekly support until he extinguishes the arrearage that accumulated after Mother filed her petition. *See id.* at 752–53.

### 3. *Communication Between Mother and Father*

■ Father argues "the court's Order that the parties communicate only in writing absent an emergency is against the evidence that was presented at trial and is an abuse of discretion." (Appellant's Br. at 16.)

In its findings of fact, the court stated in relevant part:

3. ... The Court further ordered that neither [Mother] nor [Father] is to visit the other's residence without invitation, the parties are not to deal with each other by surrogates, and [Mother and Father] are to deal with each [sic] only in writing absent an emergency. Those orders are to remain in effect.

4. The evidence at trial proved clear [sic] and convincingly that [Mother] and [Father] do not communicate very effectively and therefore the Court or-

ders [Mother] and [Father] to immediately register and complete the "Our Children, Our Divorce" program[.]

(Appellant's App. at 19–20.) The trial court stated:

8. The clear evidence at trial proves that [Mother] and [Father's] failure to communicate with each other cause [sic] safety concerns for their relationship to [G.R.G.] ... involving [Mother's] assertion of controlling, bullying and unannounced visits by [Father], exposing [G.R.G.] to the parent's conflicts.

(*Id.* at 20.)

The trial court appointed Suzanne Conger as guardian *ad litem* on June 1, 2004. She testified in relevant part:

Q Okay. Do you think it's also important given the level of conflict between [Mother] and [Father] that, uh, that [G.R.G.] not be exposed to that conflict?

A I, I would agree with that.

Q And in that regard do you think it's important that [Father] not make any unannounced visits to [Mother's] home?

A I think that [sic] appropriate courtesy.

Q Uh, and how would you recommend that any exchanges happen, you know, if [Father's] coming over to [Mother's] home, do you think it's best that he just stay in his car until [G.R.G.] comes out as opposed to coming into the home?

A What I would like to see happen, and I don't know if these parties took the helping through, uh, divorce seminar ... what I would hope is that they would both go to the Our Children Are [sic] Divorced [sic], which is the name of the program now and that they would be a little bit more civil to one another in front of [G.R.G.], and that the exchanges be a lot more comfortable for [G.R.G.].

\* \* \* \* \* \*

Q But you understand from your discussions with [Mother] that she feels intimidated by [Father]?

A Yes.

\* \* \* \* \* \*

Q Through all of the concerns that [Mother] talked to you about, are you telling this Court [Father] is a danger to this child?

\* \* \* \* \* \*

A I don't think he personally has done anything, but I think if the parents don't start getting along and show their civility to [G.R.G.], that is going to harm him.

Q They argue back and forth, don't they?

A Yes.

(Tr. at 21–22, 33–34.)

This evidence was sufficient to support the trial court's findings that Mother and Father were unable to effectively communicate with each other, and that finding supports the court's order that they communicate only in writing.

4. *Access to G.R.G.'s School and Medical Records*

▮ Father argues the trial court erred when it "proscribed, without merit, Father's ability to gather information concerning his child." (Appellant's Br. at 16.)

The trial court's order stated:

14. Because of the conflict of the parties, [Father] is not entitled to obtain medical information from the school or medical providers. However, [Mother] *must give that information*

*to [Father] in writing immediately when she obtains it.*

(Appellant's App. at 21) (emphasis supplied).

Father cites Ind.Code § 20–10.1–22.4–2, which provides:

(a) Except as provided in subsection (b), a nonpublic or public school must allow a custodial parent and a noncustodial parent of a child the same access to their child's education records.

(b) A nonpublic or public school may not allow a noncustodial parent access to the child's education records if:

(1) a court has issued an order that limits the noncustodial parent's access to the child's education records; and

(2) the school has received a copy of the court order or has actual knowledge of the court order.

Similarly, Ind.Code § 16–39–1–7 provides:

(a) Except as provided in subsection (b), a custodial parent and a noncustodial parent of a child have equal access to the parents' child's health records.

(b) A provider may not allow a noncustodial parent access to the child's health records if:

(1) a court has issued an order that limits the noncustodial parent's access to the child's health records; and

(2) the provider has received a copy of the court order or has actual knowledge of the court order.

Those statutes do not demonstrate the trial court abused its discretion, because subsection (b) of each statute indicates the court may prohibit the non-custodial parent from obtaining the child's records from the school and medical provider. We cannot find the trial court erred where, as here, the court ordered Mother to give all information to Father "immediately." (Appellant's App. at 21.)

Moreover, the Indiana Parenting Time Guidelines provide that "[e]ach parent shall immediately notify the other of any medical emergencies or illness of the child that requires medical attention." Ind. Parenting Time Guidelines I(D)(4). Thus, Mother and Father have reciprocal duties to exchange information with one another, and the trial court's order that Mother exchange such information with Father was consistent with the Indiana Parenting Time Guidelines. *See A.G.R. ex rel. Conflenti v. Huff,* 815 N.E.2d 120 (Ind.Ct.App. 2004). Therefore, we do not find the trial court erred when it ordered Father may not obtain G.R.G.'s information directly from the school or medical providers.

5. *Parenting Time Order*

Father argues the trial court erred in entering the parenting time order. Specifically, Father maintains:

The court abused it's [sic] discretion by not awarding the Father parenting time on the midweek evenings when he can and should be the person providing the care for the child. It is in the best interests of the child to spend as much time as possible in meaningful contact with his Father and certainly preferable to the child spending time with extended family members or other caregivers.

(Appellant's Br. at 26.)

In all parenting time controversies, courts are required to give foremost consideration to the best interests of the child. *Marlow v. Marlow,* 702 N.E.2d 733, 735 (Ind.Ct.App.1998), *trans. denied.* When reviewing the trial court's resolution of a parenting time issue, we reverse only when the trial court manifestly abused its discretion. *Id.* If the record reveals a rational basis for the trial court's determination, there is no abuse of discretion. *Id.* We will not reweigh evidence or reassess the credibility of witnesses. *Id.*

The trial court's order stated "Visitation is ordered pursuant to the Guardian Ad Litem's report, because it is the alternative to continued conflict of the parents." (Appellant's App. at 20.) The guardian *ad litem*'s report pertaining to Father's visitation schedule stated in pertinent part:

Father's work schedule appears to be a problem.[3] It is hard when there is a rotating schedule to get in a routine, but it is not impossible. GAL feels that [G.R.G.] benefits from time with each parent. GAL believes that Mother's schedule gives [G.R.G.] the structure and routine he needs through the week, especially during the school year.

\* \* \* \* \* \*

GAL does not believe that the straight Indiana Parenting Time Guidelines is appropriate unless Father should change his schedule to a Monday through Friday employment week. Likewise, if Father is off on a Friday and Saturday evening, Father should have the 1st option to have [G.R.G.] over [Mother's daughter] and maternal grandparents. Through the week, GAL feels [Mother's daughter] and maternal grandparents help provide a structure and routine that [G.R.G.] needs for schooling.

(*Id.* at 31) (footnote added). The guardian *ad litem* provided specific recommendations for parenting time:

1. Father shall provide Mother with his work schedule, dates and times, by the 25th of each month for the upcoming month, so that weekend and through the week parenting time can be determined.

2. Father's parenting time be [sic] one evening through the week from after school to 8:00 p.m. to be determined

by the 25th of each month prior to the next month. That on those evening [sic] Father shall be responsible to feed, do homework, and bathe [G.R.G.] before returning him home to Mother.

(*Id.* at 32.)

Father contests only the portion of the parenting time order affecting his midweek visitation with G.R.G. While we appreciate Father's desire to spend more time with his son, we cannot say the trial court erred, given Father's current work schedule, in ordering Father's visitation be in accordance with the guardian *ad litem*'s report.

Father notes in his brief that his work schedule "is something that [he] can try to re-work, however, he does have to maintain employment and provide financial support of his son . . ." (Appellant's Br. at 26.) Father may presumably revisit the issue of parenting time with the court if he is able to "re-work" his current work schedule. Accordingly, we cannot say the trial court erred in entering the parenting time order as it took into account G.R.G.'s best interest in so doing.

### 6. *Prior Restraint*

 Father asserts the trial court erred in ordering Mother and Father "forever" restrained from discussing their disputes with G.R.G. (*Id.* at 20.) He claims "this specific order from the trial court is in violation of Article I, Section 9 of the Indiana State Constitution and of the First Amendment of the United States Constitution in that it is a prior restraint on free speech." (*Id.*)

Father does not direct us to authority to support the premise that such an order is an improper prior restraint on free speech

---

3. Father has a rotating work schedule of "4 days on, 4 days off." (Tr. at 100.) He works from 9:00 a.m. to 9:00 p.m. for one week. He is then off for four days. His next four workdays are from 9:00 p.m. to 9:00 a.m.

under the Indiana Constitution. Accordingly, we are unable to address Father's state law allegation of error. *See, e.g., White v. State,* 772 N.E.2d 408, 411 (Ind. 2002) ("Because the defendant does not argue that the search and seizure provision in the Indiana Constitution requires a different analysis than the federal Fourth Amendment, his state constitutional claim is waived, and we consider only the federal claim."); *Pitman v. Pitman,* 717 N.E.2d 627, 633 (Ind.Ct.App.1999) (we will not consider a claimant's assertions on appeal where counsel has not presented a cogent argument supported by legal authority and references to the record as required by the rules).

▮▮▮▮ The First Amendment, made applicable to the States through the Fourteenth Amendment, provides "Congress shall make no law ... abridging the freedom of speech ...." A prior restraint is an order forbidding certain communications that is issued before the communications occur. *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.,* 820 N.E.2d 158, 169 (Ind.Ct.App.2005). Restraining orders and injunctions that forbid future speech activities are classic examples of prior restraints. *Id.*

▮▮▮▮ The protections the First Amendment affords against prior restraints are not triggered unless there is a state action. *Id.* The issuance of a preliminary injunction by the trial court amounts to a state action triggering the protections of the First Amendment, *id.,* as does the order Father challenges in the case before us. A prior restraint is not a *per se* violation of the First Amendment, but it comes before us with a heavy presumption that it is constitutionally invalid. *Id.*

The court's order herein is not a prior restraint that implicates the First Amendment. In *Swank v. Smart,* 898 F.2d 1247 (7th Cir.1990), *reh'g denied,* police officer Gary Swank took 17–year–old Tina Millin, a stranger, for a ride on his motorcycle between 12:30 and 1:30 a.m. Another police officer reported the incident to the chief of police and Swank was fired. Swank brought a civil rights suit, contending his dismissal from the police force deprived him of his constitutional rights to freedom of speech and freedom of association. The court held:

> The free-speech claim is quickly dispatched. The conversation between Swank and Tina on the motorcycle was speech in the literal sense, but not speech protected by the free-speech clause of the First Amendment (made applicable to the states and their subdivisions via the Fourteenth Amendment by *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925)). It was also association in the literal sense, but not association "for the advancement of beliefs and ideas." *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). The purpose of the free-speech clause and of its judge-made corollary the right of association is to protect the market in ideas, *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting), broadly understood as the public expression of ideas, narrative, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify or entertain. Casual chit-chat between two persons or otherwise confined to a small social group is unrelated, or largely so, to that marketplace, and is not protected. Such conversation is important to its participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the

speech that is protected by the First Amendment.

*Id.* at 1250–51.

Applying the same reasoning, we decline to hold a prior restraint preventing parents from discussing their disputes with their child violates the First Amendment when it does not restrain speech that is protected as a contribution to the "marketplace of ideas." *See, e.g., Rzeszutek v. Beck,* 649 N.E.2d 673, 681 (Ind.Ct.App. 1995) (the person-to-person conversations between a member of the Becks' household and the Rzeszuteks were not protected by the First Amendment because they were largely unrelated to the market in ideas and were threatening and abusive communication).

The trial court's prior restraint was also permissible to the extent it reasonably furthers G.R.G.'s best interests. The order in the case before us did not preclude Father and Mother from disagreeing with each other. Nor did it preclude Father from discussing with any other third party his disputes with Mother. Rather, it obviously reflects the trial court's reasonable belief that exposing G.R.G. to such matters would not be in the child's best interests. The restraint on Father's speech was not error.

Affirmed.

SHARPNACK, J., and VAIDIK, J., concur.