## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 04 2016, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Carl Paul Lamb
Carl Lamb & Associates
Bloomington, Indiana

ATTORNEY FOR APPELLEE

Shannon L. Robinson
Shannon Robinson Law
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Alison Truelove,

*Appellant/Cross-Appellee-Respondent,*

v.

Graham M. Hennessey,

*Appellee/Cross-Appellant-Petitioner.*

August 4, 2016

Court of Appeals Case No.
53A01-1511-DR-1879

Appeal from the
Monroe Circuit Court

The Honorable
Stephen R. Galvin, Judge

Trial Court Cause No.
53C07-1210-DR-531

**Kirsch, Judge.**

[1]  Alison Truelove ("Mother") appeals the trial court's order modifying custody, which granted legal and physical custody to Graham M. Hennessey ("Father"). Mother raises the following restated issues for our review:

I. Whether the trial court erred in finding that there was a substantial change in the children's interaction and interrelationship with Mother; and

II. Whether the trial court erred in failing to properly consider Father's history of domestic and family violence, substance abuse, relationship with the children, and the children's adjustment to home, school, and community when it found that modifying custody was in the children's best interests.

Father cross-appeals and raises the following restated issue: whether the trial court abused its discretion when it granted Mother unsupervised parenting time with the children.

We affirm.

## Facts and Procedural History

Father is a citizen of the United Kingdom and lives in Ashford-Kent, England. Mother is a citizen of the United States and lives in Bloomington, Indiana. Mother attended boarding school in the United Kingdom when she was fifteen, and afterwards, attended the University of Kent in Canterbury, England, where she obtained her degree in 2004. Mother and Father met in 2002 while Mother was attending the university and were married on October 14, 2004, in Ashford-Kent. During the marriage, Mother and Father had two daughters, O.H., born on October 20, 2005, and S.H., born on April 22, 2008 (together, "the Children").

[4] In September 2007, Mother took O.H., without Father's knowledge or consent, to the United States. Mother stayed with her mother in Virginia. Mother and O.H. returned to England in November 2007. S.H. was born a few months later in England.

[5] During their marriage, Mother and Father fought frequently, particularly over money and Father's drinking. Although Mother alleged that Father was physically violent with her, Father denied any allegations of physical violence. One time in 2008, Mother called the police during an argument, and Father was cautioned with no further action occurring. Father was never charged with any acts of domestic violence.

[6] On August 25, 2008, Mother, again without Father's knowledge or consent, took the Children and flew to the United States and to her mother's home in Virginia. Mother called Father a week later and told him she and the Children were in the United States. At that time, Father felt that the Children had been abducted by Mother. In subsequent conversations, Mother and Father agreed that Mother and the Children would return to England. Father purchased tickets for the trip; however, Mother and the Children did not return. After refusing to return to England, Mother told Father she would help him to obtain a visa to travel to the United States. However, when Father went to the American Embassy to get the visa, he learned that Mother would not support his application for the visa as she had promised.

[7]    In 2010, Father contacted the Hague Convention Office in London, which put him in contact with Patrick Stiehm, an attorney in Virginia, to represent Father in negotiations with Mother. On July 29, 2010, Mother and Father signed a Limited Separation Agreement ("the Agreement"), which contained Agreed Visitation Orders that were to be filed with the juvenile court in Virginia. The Agreement stated that the parties must inform each other in writing at least thirty days prior to any proposed change of residence. It also provided, "Each party acknowledges that to the best of his or her knowledge and understanding the other party is a fit and proper person to have custody of the children." *Resp't's Ex*. 2 at 15. The Agreed Visitation Orders stated that Father was to have two six-week visits with the Children in the United Kingdom each year. Father was also to have telephone and webcam contact with the Children three times per week for thirty minutes.

[8]    After the Agreement was signed, Father did have contact with the Children via telephone and webcam for a period of time. He also sent them cards and gifts. However, Father did not register the Agreed Visitation Orders in England. Mother, therefore, did not allow the Children to travel to England for visits with Father, and Father refused to pay child support as provided for in the Agreement. In 2010, Mother tried to enforce the child support order in England. The British court found the Children had been unlawfully abducted from the United Kingdom and did not require Father to pay child support pursuant to the Agreement.

[9] Mother began dating Melinda Herald ("Herald") in the summer of 2010. Herald has two sons, N.H., who was fifteen years old at the time of the modification hearing, and P.H., who was eleven years old at the time of the modification hearing. In August 2011, Mother and the Children moved to Bloomington, Indiana to live with Herald and did not give Father notice of her relocation. After the move to Bloomington, Father had very little contact with the Children. Mother filed a petition for dissolution of her marriage to Father in Monroe County in October 2012. At the time, Mother claimed she did not know how to locate Father and obtained notice of the petition on Father by publication. Mother achieved this by publishing the notice in a Bloomington, Indiana newspaper, making it unlikely that Father would see the published notice. A hearing on the petition for dissolution was held, at which Father did not attend. The trial court issued a decree of dissolution on December 10, 2012, in which sole legal and physical custody of the Children was awarded to Mother. As to parenting time, the decree specifically stated, "Agreement previously executed by parties adopted [and] incorporated into this decree." *Appellant's App*. at 37. Child support was not ordered because "Respondent's income and location are unknown." *Id*. at 38.

[10] On December 22, 2012, Mother sent an email to Father, notifying him that the dissolution was final. She also advised Father that the trial court had found that the prior orders for parenting time were void. She went on to tell Father that, because she had full legal and physical custody of the Children, she would decide if and when Father could speak to the Children and that all contact

between Father and the Children would be in her discretion. *Resp't's Ex*. 9. Mother also told Father that, "no child support means no contact." *Id*. After this email, Mother cut off all contact between Father and the Children. Father continued to send letters, cards, and gifts to the Children even after Mother cut off communication. During this time when Mother severed communication between Father and the Children, Father was able to obtain information about the Children by regularly contacting the school that the Children attended.

[11] Mother and Herald were married on April 30, 2013 in New York. In 2013, Mother, Herald, and Father exchanged some inappropriate and "nasty" electronic communications. *Tr*. at 217. In these communications, Mother threatened to move with the Children and not tell Father where she had gone. *Id*. Father threatened suicide if he could not speak to the Children. On one occasion, Mother called the police in England after she, Herald, and Father exchanged a series of threatening tweets. The police arrested Father, and he was cautioned, but no further action was taken.

[12] On September 1, 2014, Mother entered the living room in her home in Bloomington and found N.H. performing oral sex on S.H. Mother separated the children and called Herald to come home. When Herald came home, the police were called. Caseworker Natalie Hamer ("Hamer") from the Department of Child Services ("DCS") conducted an investigation. On September 3, 2014, Hamer interviewed Mother regarding the molestation of S.H. At that time, Mother told Hamer that she had no reason to believe that sexual abuse was occurring in the home before September 1, but that she had a

"gut feeling" this was not the first time. *Id.* at 299. During this meeting, Mother told Hamer that she did not know how to contact Father.

[13] Both O.H. and S.H. were interviewed at the local child advocacy center on September 5, 2014. During this interview, O.H. described numerous acts of molestation by N.H. Both of the Children stated that N.H. would negotiate with them, offering favors in return for sexual contact. The sexual abuse began in 2012, and O.H. stated that, after Herald caught N.H. and O.H. engaging in sexual acts, the abuse stopped for about a year. Mother and Herald did not believe O.H. about the allegations at that time and threatened to send her to a treatment facility. N.H. later confessed that he lied and admitted the molestation. Regarding the 2012 incident, Mother asked O.H. if she liked it, to which O.H. responded no. Approximately one year later, the molestations by N.H. began again and continued for about a year and a half.

[14] After the interview with the Children, Mother told Hamer that she may have witnessed a prior occurrence in 2012 where N.H. was hunched over O.H. Mother provided a detailed description of the event, but then stated that she was not sure she actually saw it. *Resp't's Ex*. 10 at 42. Mother also told Hamer that O.H. was "manipulative and good at lying." *Tr*. at 302. Following this 2012 incident, Mother stated that she and Herald had taken measures to ensure it would not occur again, including a no touch rule and a rule that the children would not be left alone together in their rooms. *Id*. At the conclusion of speaking with Hamer, Mother informed her that she planned for N.H. to return to the home and that she did not plan to take the Children out of the home. *Id*.

at 303. Mother stated that it was not fair that her relationship with Herald should be split up due to N.H.'s actions. *Id.* Mother also told Hamer she did not want counseling for the Children. *Resp't's Ex.* 10 at 42.

[15] Based on the information given to Hamer, DCS removed the Children from Mother's care, and they were placed in foster care. The Children were removed because of ongoing sexual abuse, lack of supervision by Mother, and Mother's failure to protect the Children after she learned of the prior incidents of molestation. A petition alleging the Children to be Children in Need of Services ("CHINS") was filed by DCS. Before the CHINS detention hearing on September 9, 2014, Mother told Hamer that O.H. and S.H. were both lying and that she did not believe them about their most recent disclosures. *Tr.* at 306. Mother also stated that she had called the school in an attempt to obtain a statement that O.H. was a liar. *Id.* at 307.

[16] At the CHINS fact-finding hearing, Mother testified that she was not sure if it was her or Herald who had witnessed the prior incident in 2012, but that there was no obvious sexual behavior between the children. *Resp't's Ex.* 10 at 42. She also testified that she did not remember stating the Children were liars. *Id.* The juvenile court found her statements "vague and confusing" and did not "accept her testimony as truthful." *Id.* The Children were found to be CHINS. The juvenile court specifically found that "[g]iven [Mother's] pattern of failing to protect [the Children] from sexual abuse, her belief that [the Children] are liars, and her failure to provide truthful testimony, it [was] clear that the coercive

intervention of the court [was] necessary to protect the health and safety of the [C]hildren." *Id*. at 43.

[17] At the time of removal, Mother told Hamer that Mother had no contact information for Father and that he was a dangerous person. Hamer was able to discover Father's contact information from the Children's elementary school. She contacted him and found him to be very appropriate and cooperative. Hamer believed that placement with Father at that time would have been appropriate if he lived locally. During the CHINS proceedings, the Children were placed in foster care with Dawn Mullins ("Mullins"). While the Children lived with Mullins, she regularly arranged for the Children to communicate with Father by Skype. Thereafter, Father had regular contact with the Children and sent them packages every two weeks. The Children would state to Mullins that they loved Father. During the time the Children were in foster care, Mullins had little contact with Mother, and Mother had only supervised visitation with the Children that increased in duration over time.

[18] After removal from Mother's care, the Children began attending therapy with Nancy Groover ("Groover"). Groover employed a certain behavioral therapy to address the Children's needs, and when she reached a critical phase that required the participation of a trusted parental figure, Groover did not believe that Mother was appropriate to participate as Mother had not been supportive of therapy. Instead, Groover recommended that Mullins participate in this phase of therapy with the Children. Groover also did an assessment on Father and found that he performed well on the assessment.

[19] On November 25, 2014, Father filed a petition for modification of custody in the dissolution action. Hearings were held on this petition on May 26, 2015, July 31, 2015, and August 4, 2015. At the time of the hearings, Father was thirty-three years old and lived in a two-story, three-bedroom home in Ashford-Kent, England. Father resided with his girlfriend and her two children. He was employed as a chef and waiter at a restaurant near his home and had worked there for three years. Father's mother, the Children's grandmother, lived two blocks from Father's home and visited frequently.

[20] Evidence was presented that Father had a history of alcohol abuse and abused alcohol during his marriage to Mother. Father had been convicted of drunk driving in 1999 when he was seventeen years old and in 2002 when he was twenty years old; he also had a conviction for threatening to damage or destroy property in 2004 when he was twenty-two years old. He also had several cautions, which in the United Kingdom are arrests with no conviction, but cautioned to not engage in the behavior again. These were for shoplifting in 1997, destroying or damaging property in 2002, sending a letter or other article conveying a threat in 2008,[1] and sending false message by public electronic communication network to cause annoyance/inconvenience/anxiety in 2013.[2] At the time of the hearings, Father was on probation for a battery conviction that had occurred in October 2013. He completed alcohol treatment as a part of

---

[1] This incident involved Mother and an argument regarding her taking the Children to the United States.

[2] This incident also involved Mother after she cut off all communication between Father and the Children.

his probation, and at the time of the hearings, he had not consumed alcohol for five months.

[21] At the time of the hearings, Mother was still living with Herald in Bloomington and had no other family in the area. Herald's child, P.H., lived with Mother and Herald, and Herald's mother had petitioned for guardianship of N.H. Mother was employed at Walmart as a stocker and cashier. Neither she nor Father have a driver's license.

[22] In July 2015, Mullins accompanied the Children to England to visit Father for two weeks. The Children adjusted well to Father's home and got along well with Father's girlfriend and her children. Mullins's observations of the interaction between Father and the Children was that Father loved the Children and is a genuinely caring Father. *Tr.* at 345-46. Mullins testified that she had no concerns about the safety of the Children if they were placed in Father's custody. *Id.* at 349.

[23] At the conclusion of the hearings, the trial court issued an order modifying custody. In the order, the trial court awarded legal and physical custody of the Children to Father and gave Mother unsupervised parenting time. Mother's parenting time is to be six weeks each summer and two weeks each Christmas holiday. Mother is also allowed to communicate with the Children by Skype, telephone, or other electronic means for thirty minutes three time a week while they are in Father's custody. While the Children are spending time with Mother, Father is allowed to communicate with the Children for thirty minutes

three times a week. Mother was also ordered that she must not allow N.H. to have any contact with the Children, she must allow DCS immediate access to the Children at any time during her parenting time, and must not listen to the communications between the Children and Father. Mother now appeals, and Father cross-appeals.

## Discussion and Decision

[24] We review custody modifications for an abuse of discretion and must grant latitude and deference to trial courts in family law matters. *Bailey v. Bailey*, 7 N.E.3d 340, 343 (Ind. Ct. App. 2014) (citing *Wilson v. Myers*, 997 N.E.2d 338, 340 (Ind. 2013)). We will set aside judgments on custody modifications only when they are clearly erroneous, and we will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *In re Paternity of M.P.M.W.*, 908 N.E.2d 1205, 1208 (Ind. Ct. App. 2009). When reviewing the trial court's decision, we may neither reweigh evidence nor judge the credibility of witnesses. *In re Marriage of Sutton*, 16 N.E.3d 481, 484 (Ind. Ct. App. 2014). We consider only the evidence favorable to the trial court's judgment and all reasonable inferences derived from it. *Id.* Mother is appealing from a decision in which the trial court entered specific findings of fact and conclusions thereon. *See* Ind. Trial Rule 52(A). Therefore, we must first determine whether the evidence supports the findings and, second, whether the findings support the judgment. *In re M.P.M.W.*, 908 N.E.2d at 1208.

[25]     A trial court may not modify a child custody order unless: "(1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 and, if applicable, section 8.5 of this chapter." Ind. Code § 31-17-2-21(a)). Factors to consider in deciding whether to modify custody include whether there has been a substantial change related to the child's age; the wishes of the parent(s); the child's wishes; the relationship the child has with his or her parent(s), sibling(s), and others; the child's adjustment to home, school, and community; the mental and physical health of all involved; any evidence of domestic or family violence; and any evidence that the child has been cared for by a de facto custodian. Ind. Code § 31-17-2-8. A party seeking modification of custody bears the burden of demonstrating that the existing arrangement is no longer in the best interests of the child and that there has been a substantial change in one or more of the enumerated statutory factors. *Bailey*, 7 N.E.3d at 343.

## I. Substantial Change in Circumstances

[26]     Mother argues that the trial court abused its discretion in modifying custody of the Children in favor of Father because the trial court failed to properly identify which of the statutory factors had been substantially affected. She asserts that, even though the trial court concluded that "[t]here has clearly been a substantial change in the [C]hildren's interactions with their mother," there were not enough facts or circumstances to support that determination. *Appellant's App.* at 20. Mother claims that DCS involvement in the lives of her and the Children

should not have constituted a substantial change because she had put reasonable safeguards in place after her suspicion of inappropriate behavior in 2012, and she notified the authorities following her discovery of the incident in 2014. She believes that these actions should be viewed as appropriate attempts to fix a problematic situation and not evidence of her irresponsibility and unfitness as a parent.

[27] In its order modifying custody, the trial court concluded that custody of the Children should be modified in favor of Father based on a substantial change in the interaction and interrelationship of the Children with Mother. The evidence most favorable to the trial court's judgment showed that the Children were removed from Mother's care in September 2014 due to repeated molestations by N.H., their step-brother. Mother and Herald were aware of previous sexual contact between N.H. and O.H. in 2012, and Mother did not take adequate measures to protect the Children from further sexual abuse by N.H. When the incident occurred in September 2014, Mother was not truthful in her statements to DCS regarding her knowledge of N.H.'s prior molestation of O.H. Mother also initially refused to have N.H. leave the home and told Hamer that the Children were lying; Mother also attempted to get documentation form the Children's school that O.H. was a liar. Further, Mother's testimony at the modification hearing was not consistent with prior statements that she had made to Hamer. At the time of the hearing, the Children had not been returned to Mother's care since their removal, and Mother failed to take responsibility for allowing the Children to be repeatedly

molested by N.H. Mother was also not supportive of the Children's therapy, and their therapist, Groover, found that Mother was not an appropriate person to participate in the Children's treatment with them.

[28] Mother cites to *Wiggins v. Davis*, 737 N.E.2d 437 (Ind. Ct. App. 2000) for support of her argument. In that case, the trial court modified custody of a child to father because the child had been molested by a half-brother while in the mother's custody and found that the molestation constituted a substantial change in the child's interaction and interrelationship with the child's siblings. *Id*. at 442. In her argument, Mother seems to acknowledge that if the trial court in the present case had made the same conclusion, "the facts and law may have supported it," but that, since the trial court concluded there was a substantial change in the interaction and interrelationship with Mother, such a conclusion was not supported. *Appellant's Br*. at 16. However, we find that the evidence in the present case surpasses that in *Wiggins*, and therefore, that case is not inconsistent with the trial court's conclusion in the present case. The evidence here established that Mother had knowledge of past acts of molestation by N.H. and failed to take appropriate steps to protect the Children from further molestation. After the Children were removed, Mother called the Children liars, initially refused to take steps to ensure the Children were safe from molestations, made inconsistent statements about her knowledge of the incidents of molestation, and denied that the Children needed counseling. Her actions caused the Children to be placed in foster care, where they remained for

over a year. We cannot say that the trial court erred in awarding custody to Father.

[29] We conclude that, based on this evidence, there was a substantial change in the Children's interaction and interrelationship with Mother because she failed to protect the Children from being sexually abused by N.H. The evidence established that, although Mother was aware of an incident of molestation by N.H. in 2012, she failed to take proper actions to ensure the safety of the Children from further molestation. Mother's arguments to the contrary are requests for this court to reweigh the evidence, which we cannot do. *In re Marriage of Sutton*, 16 N.E.3d at 484.

## II. Best Interests of the Children

[30] Mother argues that the trial court erred in awarding custody to Father because its determination that a modification of custody was in the Children's best interests was an abuse of discretion. She specifically contends that it was error to modify custody in favor of Father due to his history of domestic and family violence, substance abuse, and his lack of a relationship with the Children. Mother further asserts that the trial court failed to consider the Children's adjustment to their home, school, and community when it modified custody.

[31] Initially, we note that Mother's argument is merely an invitation for this court to reweigh the evidence, which we do not do on appeal. *Id*. In its order modifying custody, the trial court made specific findings and conclusions regarding allegations of domestic violence and Father's alcohol abuse. In its

findings, the trial court discussed Mother's allegations of domestic violence, the fact that the couple argued regularly, that the police were called once due to an argument, Father's alcohol abuse, and his alcohol-related offenses. *Appellant's App.* at 14, 18. In its conclusions, the trial court discussed Mother's allegations of domestic abuse and concluded that, "[g]iven [Mother's] evasive and untruthful testimony, there is insufficient evidence to conclude that acts of domestic violence occurred between [Father] and [Mother] during their marriage." *Id.* at 20. We, therefore, find that the trial court considered Mother's allegations of domestic violence and found them not to be credible, which was totally within the court's province to do, and we give deference to that determination. *Bailey*, 7 N.E.3d at 343.

[32]   As for Father's history of alcohol abuse, the trial court concluded that Father clearly had a history and it was of great concern. *Appellant's App.* at 20. However, Father's two convictions for drunk driving were over thirteen years before the hearing dates, and Father had recently undergone alcohol treatment as part of his probation. *Id.* The trial court also concluded that although Father's alcohol abuse was concerning, he had established a stable home, living with his girlfriend and her two children and maintaining stable employment. We, therefore, find that the trial court considered Father's history of alcohol abuse and weighed the evidence in making its determination, which was totally within the court's province to do, and we give deference to that determination. *Bailey*, 7 N.E.3d at 343.

[33]     As to Father's lack of a close relationship with the Children, the trial court made findings regarding Mother's consistent denial of contact between Father and the Children. Mother initially took the Children with her to the United States without any notice to Father, and then after agreeing that they would return to England, Mother never used the plane tickets purchased by Father. *Appellant's App*. at 14. After the Agreed Visitation Orders were issued by the court in Virginia, Mother never allowed the Children to visit Father in England. *Id*. Although Father did have contact with the Children via telephone and webcam, Mother later cut off all contact between the Children and Father after the dissolution decree was issued. *Id*. at 14, 15. After the Children were removed from Mother's custody and placed in foster care, Father resumed contact with the Children, which continued up to the date of the modification hearings. *Id*. at 17. Therefore, Father's prior lack of a close relationship with the Children was largely Mother's creation. It was within the purview of the trial court to reject any allegations regarding the lack of a close relationship.

[34]     Lastly, Mother's assertion that the trial court failed to consider the Children's adjustment to their home, school, and community when it modified custody ignores the fact that the Children had been removed from Mother's home and in foster care for over a year at the time of the modification hearings, which had already necessitated a change in home and school. Mother's argument seems to be that the trial court erred in granting modification because there was not sufficient evidence to conclude that a substantial change occurred in the Children's adjustment to their home, school, and community, necessitating

modification. However, in making a determination to modify custody, the trial court is only required to find a substantial change in one of the factors enumerated in Indiana Code sections 31-17-2-8 or 31-17-2-8.5. Ind. Code § 31-17-2-21(a). Here, the trial court found that a substantial change had occurred in the interaction and interrelationship of the Children and Mother, which was sufficient to modify custody. We, therefore, conclude that the trial court did not abuse its discretion in finding that modification of custody to Father was in the best interests of the Children.

## III. Cross-Appeal

[35] Father cross-appeals, arguing that the trial court abused its discretion when it granted Mother unsupervised parenting time with the Children. He contends that granting Mother unsupervised parenting time would endanger the Children's physical health or significantly impair their well-being and emotional development. Father asserts that, at the time of the final hearings dates, Mother only had supervised visitation with the Children and that DCS believed it was in the Children's best interests not to be left unsupervised with Mother due to her failure to previously protect them from years of sexual abuse. He also claims that the safeguards that the trial court put in place were insufficient to protect the Children.

[36] "'In all visitation controversies, courts are required to give foremost consideration to the best interests of the child.'" *Hatmaker v. Hatmaker*, 998 N.E.2d 758, 760 (Ind. Ct. App. 2013) (quoting *Marlow v. Marlow,* 702 N.E.2d 733, 735 (Ind. Ct. App. 1998), *trans. denied*). We review parenting time

decisions for an abuse of discretion. *Id.* at 761. A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.* If the record reveals a rational basis supporting the trial court's determination, no abuse of discretion is found. *Marlow*, 702 N.E.2d at 735. We will not reweigh evidence or judge the credibility of witnesses. *Id.*

[37]     "The right of non-custodial parents to visit with their children is a 'sacred and precious privilege.'" *Appolon v. Faught,* 796 N.E.2d 297, 300 (Ind. Ct. App. 2003) (quoting *McCauley v. McCauley,* 678 N.E.2d 1290, 1292 (Ind. Ct. App. 1997), *trans. denied*). Restriction of parenting time is governed by Indiana Code section 31-17-4-1(a), which provides:

> A parent not granted custody of the child is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time by the noncustodial parent might endanger the child's physical health or significantly impair the child's emotional development.

"Even though the statute uses the word 'might,' this [c]ourt has previously interpreted the language to mean that a court may not restrict parenting time unless that parenting time 'would' endanger the child's physical health or emotional development." *Hatmaker*, 998 N.E.2d at 761 (citing *D.B. v. M.B.V.,* 913 N.E.2d 1271, 1274 (Ind. Ct. App. 2009)). A party who seeks to restrict a parent's visitation rights bears the burden of presenting evidence justifying such a restriction. *Id.* The burden of proof is by a preponderance of the evidence. *Id.*

[38] Here, in its order, the trial court made conclusions regarding Mother's parenting time, specifically that establishing appropriate parenting time that sufficiently protects the health and safety of the Children is complicated by Mother's failure to protect the Children in the past and that the distance between the parents further complicates the issue. *Appellant's App.* at 21. The trial court concluded that certain restrictions should be placed on Mother's parenting time, including that Mother must not allow N.H. to have any contact with the Children and that when the Children are in her care, Father should be allowed to communicate with the Children via Skype, telephone, or other electronic means for thirty minutes, three times per week without Mother listening to the communication. *Id.* Additionally, Mother was ordered that she must allow DCS representatives to have immediate access to the Children at any time during her parenting time. *Id.* at 22. Any violations of the trial court's order shall be punishable by contempt, including incarceration. *Id.*

[39] It was within the trial court's discretion to grant unsupervised parenting time, and the trial court set up safeguards to ensure the safety of the Children. Such safeguards were to be followed with the consequence of contempt for non-compliance. We, therefore, conclude that it was not against the logic and effect of the facts and circumstances before the court to grant Mother unsupervised parenting time with the Children and adequate safeguards were put in place to protect the Children. The trial court did not abuse its discretion.

[40] Affirmed.

Riley, J., and Pyle, J., concur.