


FILED

Dec 02 2025, 9:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

**N.R.,**

*Appellant-Petitioner*

v.

**A.R.,**

*Appellee-Respondent*

---

December 2, 2025

Court of Appeals Case No.
25A-PO-783

Appeal from the Lake Superior Court

The Honorable Mark A. Hardwick, Special Judge

Trial Court Cause No.
45D06-1203-JP-742
45D06-2007-PO-107

---

**Opinion by Judge May**
Chief Judge Altice and Judge Foley concur.

**May, Judge.**

[1]     N.R. ("Mother") appeals the trial court's orders concerning her children with A.R. ("Father"), Ad.R. and An.R. (collectively, "Children"). She presents several issues for our review, which we restate as:

> 1. Whether the trial court abused its discretion when it admitted the reports regarding the family's participation in services at the Family House that Scott Wagenblast prepared while he was Guardian ad Litem ("GAL");[1]
>
> 2. Whether the trial court erred when it ordered reunification therapy and parenting time with Father because the order was contrary to Children's best interests;
>
> 3. Whether the trial court delegated its judicial authority to a third party when it ordered the therapy provider to determine when the parties completed an Intensive Outpatient Program ("IOP");
>
> 4. Whether the trial court abused its discretion when it ordered Mother to pay half of all fees due to Wagenblast for services provided during the proceedings, even though some fees were incurred after he was removed as GAL; and
>
> 5. Whether the trial court erred when it ordered Mother to pay a portion of Father's attorney fees or face incarceration as part of its contempt sanction.

We affirm in part, reverse in part, and remand.

---

[1] Herein, we refer to Wagenblast as "GAL Wagenblast" during the times he was appointed as GAL and as "Wagenblast" during other times.

## Facts and Procedural History

[2] Mother and Father (collectively, "Parents") are the parents[2] of Ad.R., born in 2007, and An.R., born in 2012.[3] This case began as a paternity case in 2012, and the parties have been litigating custody and related matters ever since. In 2018, the trial court granted Mother primary physical custody of Children and placed Father on a schedule "stepping-up" his parenting time to comply with the Indiana Parenting Time Guidelines (the "IPTG") effective April 1, 2018.[4] (App. Vol. II at 54.)

[3] In April 2018, January 2019, and February 2020, the parties filed competing petitions for rules to show cause, each asking the trial court to find the other in contempt for interfering with the trial court's custody order. In July 2020, Mother requested and was granted an ex parte protective order against Father. In September 2020, the trial court found both parties in contempt – Mother for interference with Father's parenting time and Father for failure to participate in reunification therapy with Children.[5] Also in September 2020, the trial court issued a protective order in favor of Mother to expire in July 2022.

---

[2] Mother and Father were also the parents of L.R., born 2011. As noted below, L.R. died in an accident in 2022.

[3] The record does not indicate An.R.'s birth date. We based his birth year on his age in relation to L.R.'s age. L.R. was born in August 2011.

[4] The terms of this phased-in schedule are unclear from the record.

[5] Mother appealed the trial court's order finding her in contempt. We affirmed the trial court's decision. *See Matter of Paternity of A.C.R.*, 20A-JP-1851, 171 N.E.3d 681, *5 (Ind. Ct. App. May 26, 2021) (mem.).

[4] In October 2020, Mother filed a petition to modify parenting time. In December 2020, Father filed a response to Mother's petition to modify parenting time and filed a petition for rule to show cause why Mother should not be held in contempt, alleging Mother denied him parenting time. In January 2021, Mother filed a second verified petition to modify parenting time. In July 2021, the trial court appointed GAL Wagenblast to the case.

[5] In August 2021, GAL Wagenblast filed a motion to modify Father's supervised parenting time, asking the trial court to change the location of Father's supervised parenting time from Mother's home to Family House. In September 2021, the trial court granted GAL Wagenblast's motion. In February 2022, the trial court ordered Parents to complete their intakes with Family House within ten days and ordered that Father and Children begin reunification counseling at Clarity Clinic, with Parents and Children to complete their intake appointments at Clarity Clinic within seven days. Father complied with the trial court's order and completed intake sessions with both Family House and Clarity Clinic.

[6] In August 2022, Parent's child L.R. died in a train accident. In November 2022, Father filed a motion to modify custody and parenting time. In January 2023, Children's adult half sibling, Jazmin, passed away. Mother completed her intake session with Family House in February 2023. On August 11, 2023, GAL Wagenblast filed a motion to suspend his services, which the trial court granted.

[7] The trial court held a final hearing on all pending matters on September 11, 2023, September 25, 2023, October 2, 2023, and January 8, 2024. The pending matters dated back to Mother's petition to modify parenting time that she filed in October 2020. Prior to the presentation of evidence, Mother filed a motion for findings of fact and conclusions of law pursuant to Indiana Trial Rule 52.

[8] Father called Wagenblast to testify regarding his investigation and Parents' subsequent compliance with the trial court's orders relevant to parenting time. As part of that testimony, Father's counsel attempted to enter into evidence records from Family House (the "Family House Records"), where the trial court had ordered Father's parenting time to take place. Mother's counsel objected and argued the records were hearsay. Father's counsel responded that "in our pretrial conference we agreed that the Family House [R]ecords would be admitted." (Tr. Vol. II at 18.) Father's counsel also stated that "part of the reason that . . . the Court allowed him to withdraw as Guardian Ad Litem was because we were going to be stipulating to the Family House [R]ecords, as well as [Wagenblast's] billing statement." (*Id*. at 19.) Mother's counsel responded:

> Yeah, it occurred to me since he's no longer a party, he's not making a recommendation, and the statute provides that a Guardian Ad Litem is allowed to testify and rely upon hearsay that is used in formulating his opinion and making his recommendations to the Court. He's not doing that. So now it's occurred to me we need to tighten the noose on hearsay.

(*Id*.) The trial court overruled Mother's objection and admitted the Family House Records.

[9] The Family House Records indicated Mother did not complete her intake until February 2023, a year and a half after the trial court ordered her to complete it. They also noted a time that Mother took Children to Family House to visit with Father but Children did not leave the car to have the visit. Wagenblast also testified about his efforts to get court-ordered reunification counseling to begin. He indicated it was difficult to find a mental health professional willing to conduct supervised therapeutic reunification parenting time or counseling between Father and Children. While Father completed all necessary intake requirements, several therapists did not work out for various reasons.

[10] Finally, Father entered Wagenblast's billing statements into evidence. Wagenblast's total fees were $14,661.72, of which Father had paid $4,500 and Mother had paid $2,500 as of September 11, 2023, leaving $7,661.72 of the fees remaining unpaid as of September 11, 2023.

[11] Dr. Jill Hus, Children's therapist since 2019, also testified. Dr. Hus told the trial court that Ad.R. suffered from ADHD, depression, anxiety, and post-traumatic stress disorder and that An.R. suffered from post-traumatic stress disorder and anxiety. Dr. Hus testified there was a point early in her treatment of Children when they had desired a relationship with Father but Children later refused the joint sessions with Father.

[12] Father testified that he has made all efforts to comply with the previous trial court orders regarding counseling and parenting time with Children including participating in several intake sessions for therapeutic parenting time sessions

with Children, visiting with Children through the Family House, and engaging in individual therapy. He told the trial court that, outside of the Zoom session arranged by the Clarity Clinic, he had not seen Children since December 2020. He testified that he believed Mother had been abusing the current protective order by using it to prevent Father from having any meaningful contact with Children.

[13] Mother testified that Children did not want to visit with Father and that they were afraid of Father. Mother told the trial court she would bring Children to some of the exchanges, but Children refused to get out of the vehicle. Mother also stated that she believed that Father was a danger to Children based upon his prior gang affiliation with the Latin Kings. Father denied this. He acknowledged that he was associated with the Latin Kings when he was younger and still spent time with Latin Kings members, but he asserted he had not been a member of the gang for over twenty years.

[14] At the end of the January 2024 hearing, the trial court ordered the parties to submit proposed findings of fact and conclusions of law. On March 3, 2025, the trial court issued its order denying Mother's petition to modify parenting time and denying her request to extend the protective order. To facilitate therapy and parenting time, the trial court ordered Parents and Children to engage in an IOP. The trial court stated Parents and Children "shall continue the IOP process until the provider recommends there is no further work that needs to be or can be done." (*Id*. at 66.)

It also found Mother in contempt for violating the trial court's orders regarding Father's parenting time multiple times. As a sanction for that contempt, the trial court ordered Mother to serve a thirty-day jail sentence that was "suspended by purging herself" of the contempt of the trial court's earlier orders by "fully cooperat[ing] with the orders" (*id*. at 63), paying $5,000 in Father's attorney fees, and participating in the IOP. The trial court ordered Mother to pay $4,830.86 and Father to pay $2,830.86 to cover Wagenblast's fees.

## Discussion and Decision

### 1. Admission of the Family House Records

Mother contends the trial court abused its discretion when it admitted the Family House Records because those records were inadmissible hearsay. "We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Henderson v. Henderson*, 139 N.E.3d 227, 236 (Ind. Ct. App. 2019). "A trial court does not abuse its discretion unless its decision is clearly against the logic and effect of the facts and circumstances before it." *Id*.

During the fact-finding hearing, Father attempted to enter the Family House Records into evidence. Mother objected, arguing those records were hearsay because Wagenblast was "no longer a party, he's not making a recommendation, and the statute provides that a Guardian Ad Litem is allowed to testify and rely upon hearsay that is used in formulating his opinion and making his recommendations to the Court. He's not doing that." (Tr. Vol. II

at 19.)  The trial court admitted the Family House Records over Mother's objection.  Mother argues:

> Because [Wagenblast] was not actually acting as the Court appointed GAL at the time of the hearing, his testimony was not afforded the protections of Ind. Code § 31-17-2-12, and his testimony was still subject to the standard Indiana Rules of Evidence.  In other words, "former guardian ad litems," are not exempt from the [R]ules of [E]vidence simply because they, at one time, had an official role in a case.  As soon as the Court issued an order terminating, or in this case, suspending his services as GAL, all of the statutory and case law protections of a GAL's testimony were also terminated.

(Mother's Br. at 32.)

[18]   "'Hearsay' means a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted."  Ind. Evid. R. 801(c).  "Hearsay is not admissible unless these rules or other law provides otherwise."  Ind. Evid. R. 802.  Pursuant to Indiana Code section 31-17-2-12(b), an investigatory report made in the process of a custody case "(1) may be received in evidence at the hearing; and (2) may not be excluded on the grounds that the report is hearsay or otherwise incompetent[,]" as long as it fulfills the requirements of Indiana Code section 31-17-2-12(c).[6]  Further, Indiana Guardian ad Litem Guidelines Rule 3.12

---

[6] Indiana Code section 31-17-2-12(c) states:

states "[a] GAL report may not be excluded on hearsay grounds if: 1. the report is timely submitted to the court and the parties or their counsel; and 2. the GAL has properly maintained and made available their file, if requested, pursuant to these rules."

[19] Wagenblast created the Family House Records during his tenure as GAL in the case. Indiana Code section 31-17-2-12(b) and Indiana State Guardian ad Litem Guidelines Rule 3.12 both provide that a GAL's records are not excludable on hearsay grounds. The language in Indiana Code section 31-17-2-12(b) and Indiana State Guardian ad Litem Guidelines Rule 3.12 does not indicate a time limit for the use of those records, such as the end of a GAL's service in the case. We decline Mother's invitation to graft language limiting the circumstances under which a GAL's records can be admitted. As the Family House Records were admitted pursuant to Indiana Code section 31-17-2-12(b) and Indiana State Guardian ad Litem Guidelines Rule 3.12, we conclude the trial court did not abuse its discretion.

---

[t]he court shall mail the investigator's report to counsel and to any party not represented by counsel at least ten (10) days before the hearing. The investigator shall make the following available to counsel and to any party not represented by counsel:

(1) The investigator's file of underlying data and reports.

(2) Complete texts of diagnostic reports made to the investigator under subsection (b).

(3) The names and addresses of all persons whom the investigator has consulted.

Mother does not argue the requirements of Indiana Code section 31-17-2-12(c) were not met.

## 2. Children's Best Interests

[20] Mother argues the trial court erred when it denied her petition to restrict Father's parenting time and ordered reunification therapy, because the trial court's findings did not support its conclusion that this was in Children's best interests. A decision about parenting time requires us to "give foremost consideration to the best interests of the child." *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013) (quoting *Marlow v. Marlow*, 702 N.E.2d 733, 735 (Ind. Ct. App. 1998), *trans. denied*); *see also* Ind. Code § 31-17-4-2 ("The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child.").

[21] Mother requested the entry of findings and conclusions pursuant to Indiana Trial Rule 52(A). In such a circumstance, our standard of review is well settled:

> First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Moriarty v. Moriarty*, 150 N.E.3d 616, 626 (Ind. Ct. App. 2020) (quoting

*Trabucco v. Trabucco*, 944 N.E.2d 544, 549 (Ind. Ct. App. 2011), *trans. denied*),

*trans. denied*. We accept unchallenged findings as true, *M.M. v. A.C.*, 160

N.E.3d 1133, 1135 (Ind. Ct. App. 2020), and we will affirm "if the

unchallenged findings are sufficient to support the judgment." *Moriarty,* 150

N.E.3d at 626.

[22]     Mother does not specifically challenge any of the trial court's findings, and thus

we accept them as true. Instead, Mother contends the trial court should have

given more weight to its findings regarding Dr. Hus's testimony because Dr.

Hus was the only non-party witness to speak to Children. The trial court found,

based on Dr. Hus's testimony:

> 8. [Children's] therapist, Dr. Jill Hus, testified as to her
> credentials as a licensed mental health counselor, a national
> certified counselor, and a PhD. Dr. Hus testified that she
> specializes in working with children, adolescents and young
> adults. She explained that she had been the therapist for
> [Children] since 2019.
>
> 9. Dr. Hus testified that [Ad.R.] suffers from ADHD,
> depression, anxiety and post-traumatic stress disorder. [Ad.R.'s]
> diagnosis of post-traumatic stress disorder pre-dates the deaths of
> his brother and sister and was a result of physical violence from
> Father towards Mother and Father towards [Ad.R.] and his
> siblings. Dr. Hus testified that [Ad.R.] had indicated to her very
> early in her therapeutic relationship with him that [Father] had
> tried to choke him. Dr. Hus testified that [An.R.] suffers with
> post-traumatic stress disorder and anxiety. She also indicated
> that [An.R.'s] diagnosis with post-traumatic stress disorder pre-
> dates the death of his siblings and is secondary to physical attacks

from Father to Mother in [Children's] presence and Father striking [An.R.].

10. Dr. Hus did testify there was a point early in her treatment of [Children] when they had desired to have a relationship with Father. However, as the litigation dragged on, Dr. Hus testified that [Children] later refused joint sessions with Father. Dr. Hus also stated she believed [Children's] voices needed to be heard.

11. Dr. Hus testified she held one session with Father, despite the court's prior order for Father to participate in one session per month with [Children]. Dr. Hus testified that she did not keep in contact with Father.

12. Magistrate Talian indicated in her September 16, 2020 order that "the Court questions the opinion of the therapist that unsupervised parenting time with Father would be detrimental to [Children] because [Children's] therapist, Jill Hus, has never reached out to Father. Ms. Hus has discussed [Children's] therapy with Mother on numerous occasions. As a result, Ms. Hus did not have the benefit of Father's perspective when arriving at her opinion."

13. This Court finds that statement of Magistrate Talian to be true still three (3) years later. This Court ordered Dr. Hus to provide bi-monthly updates to [Parents] and counsel on September 11, 2023. As of the January 8, 2024 hearing, Dr. Hus had once again failed to do so – at least to Father.

14. Dr. Hus testified that [Children] understandably struggled after the loss of their brother [L.R.] in late August 2022 when he was hit by a train. Dr. Hus also indicated that the untimely loss of [Children's] older sister, Jazmin, was an additional factor leading to their lack of stability and struggles in [sic] their mental health. Dr. Hus explained that much of the medical emergency

taking Jazmin's life took place with [Children] present at the family home on January 2, 2023.

15. Dr. Hus testified that she believed it would lead to a retraumatization of [Children] to be forced to spend parenting time with Father at this point. She went on to explain that at least one of [Children] had suffered suicidal ideations over the last few years. It was inquired as to whether Dr. Hus could be the therapist to work with Father and [Ad.R.] or Father and [An.R.] for purposes of reunifying or healing their relationship, and Dr. Hus indicated she could not. She saw that as a potential conflict and indicated it would only undermine her relationship with [Children] but [sic] would likely limit their faith or confidence in mental health counseling in the future.

\* \* \* \* \*

20. The Court inquired of Dr. Hus as to how best to proceed to reunify [Children] with [Father], and she answered that the stability of [Children] is required before beginning any type of parenting time. At the prompting of Father's counsel, Dr. Hus indicated that should she receive a letter from Father directed to either of [Children], she would share that with [Children] in a therapeutic setting.

21. While there seems to be no doubt to this Court that Father has clearly played a role in causing problems with his relationship with [Children] (family violence, gang activity earlier in his life, failure to follow up with certain contact and counseling requirements), all of this could have been avoided had Mother, and to a lesser extent Dr. Hus, followed this Court's orders and require[d] [Children to] visit with Father throughout that history of this case over the past 4 – 5 years.

\* \* \* \* \*

48. Father believes one of the appropriate consequences for Mother's contempt above would be for the Court to modify custody of [Children] to him. The Court is NOT willing to go that far. [Children] have not spent any time with Father since the Court took over as special judge in this case. The Court cannot ignore testimony from Dr. Hus of [Ad.R.'s] statement that [Father] had tried to choke him. Dr. Hus testified that [An.R.] suffers with post-traumatic stress disorder and anxiety. She also indicated that [An.R.'s] diagnosis with post-traumatic stress disorder pre-dates the death of his siblings and is secondary to physical attacks from Father to Mother in [Children's] presence and Father striking [An.R.].

\* \* \* \* \*

51. This Court is concerned that Dr. Hus has not gotten [Children] to the point they are ready to visit with Father. The Court understands how she sees her role with [Children], but the Court is concerned she may be an obstacle to [Children] visiting with Father. The Court will not specifically rule that [Children] stop counseling with her at this time, but if the IOP is hindered by her continued role, the Court may revisit that issue at a later point.

(App. Vol. II at 57-64.)

[23]     Mother's argument asks us to ignore the trial court's findings regarding any negative effects Dr. Hus's therapy had on Children or Father and instead wants us to consider only Dr. Hus's testimony about Children's struggles related to their relationship with Father. As the trial court found, while the relationship between Children and Father was complicated, Dr. Hus had defied court orders designed to help repair that relationship. In addition, the trial court found that

Dr. Hus's position as Children's therapist may be a detriment to the ultimate goal of a healthy relationship with Father, to the point that it reserved for later consideration whether Dr. Hus should be removed as Children's therapist.

[24] In addition to its findings regarding Dr. Hus's testimony, the trial court entered findings based on Wagenblast's testimony about Mother's lack of cooperation with Family House and Mother's continued thwarting of Father's parenting time, which was sufficient for the trial court to find Mother in contempt. It found, "this Court cannot excuse Mother's clear delaying conduct in following court orders for Father's parenting time – supervised and unsupervised, in cooperating with and complying with court orders requiring reunification counseling and following court orders regarding communications about [Children] with Father." (*Id*. at 63.) Further, the trial court found "Father testified that he believes Mother has abused the current protective order and used it prevent Father from having any meaningful contact with [Children]." (*Id*. at 61.) Finally, regarding Father's parenting time prior to its order, the trial court noted, "Father has not had parenting time with [Children] since December 2020. Without drastic changes, this Court does not see how this changes." (*Id*. at 60.)

[25] Regarding Father's steps toward reunification with Children, the trial court listed nine steps Father completed over the course of the litigation to comply with the trial court's orders, including completing a psychological evaluation and intake appointments with providers for reunification counseling and participating in some reunification counseling sessions. It noted Father testified

"he appeared for each visit [with Children] on time" but he "was only able to exercise one parenting session on October 7, 2020," and only with L.R. (*Id*. at 61.)

[26] Based on those findings and others, the trial court concluded it would not be in Children's best interests to award Father primary physical custody. However, the court also determined it was "necessary for this Court to uphold previous reunification-like therapy and parenting time with these parties in order to properly protect the mental health and best interests of [Children]." (*Id*. at 64.) The trial court ordered the parties to engage in an IOP designed to "get [Children] and Father back together." (*Id*. at 66.) Because the findings support the trial court's conclusion that transitioning from the status quo of Father not having parenting time as ordered to the IOP reunification process was in Children's best interests, we conclude the trial court did not err. *See*, *e.g.*, *Williams v. Williams*, 266 N.E.3d 221, 232 (Ind. Ct. App. 2025) (the evidence supported the trial court's findings and the trial court's findings supported its conclusion granting father primary custody of the child based on findings that mother intentionally thwarted father's ability to see child).

## 3. Delegation of Judicial Authority

[27] Mother asserts the trial court impermissibly delegated its judicial authority to a third party when it stated in its order that "[t]he parties and [Children] shall continue the IOP process until the provider recommends that there is no further work that needs to be or can be done." (App. Vol. II at 66.) Mother contends

"[b]y granting the IOP provider the authority to determine how long Father must engage in the process in order to reunify himself with [Children], the Trial Court improperly delegated judicial authority to said provider." (Mother's Br. at 30.) In support of her argument, Mother relies on our holding in *Matter of Paternity of A.R.R.*, 634 N.E.2d 786 (Ind. Ct. App. 1994).

[28] In that case, the trial court ordered supervised visitation between mother and child "until Family Connection Center [the provider supervising visitation] feels mother is no longer acting against Family Connection Center's rules. Visitation is to be increased upon the therapist's recommendations" *Id.* at 789 (internal quotation and citation to the record omitted). The mother argued that allowing the Family Connection Center and therapist to decide when visitation could be increased impermissibly delegated its authority to modify visitation without oversight from the trial court. *Id.* We agreed, noting that it "was appropriate for the trial court to seek the recommendations of the Family Connection Center and [therapist] in determining visitation" however "a modification of visitation may not be granted absent a determination by the court that the modification would serve the best interests of the child." (*Id.*) In holding the trial court abused its discretion we stated:

> No statute permits this determination to be delegated to a caseworker, probation officer, guardian, or other authority, and to do so would be to undermine the safeguards inherent in reserving to a detached and impartial court the task of weighing the many considerations relevant to visitation. By authorizing the Family Connection Center to determine when supervised visitation is no longer needed and when the frequency of

> visitation may be increased, the court impermissibly endowed that agency with judicial powers.

*Id*.

[29] *A.R.R.* is distinguishable. In that case, the trial court retained no oversight regarding the modification of mother's visitation – instead the visitation supervision provider and a therapist were given the sole discretion to determine when the terms of mother's visitation could change. In contrast, the trial court here did not delegate authority to modify parenting time or custody. The IOP provider was tasked only with determining when the program had nothing further to offer the family – a decision squarely within the provider's professional expertise and one that does not itself modify parenting time or custody. Indeed, *A.R.R.* itself recognized "it was appropriate for the trial court to seek the recommendations of the Family Connection Center and [therapist] in determining visitation." 634 N.E.2d at 789. Trial courts routinely rely on service providers' factual assessments about program completion in family law cases – whether a parent has completed anger management, parenting classes, substance abuse treatment, or reunification therapy. These are professional evaluations about service completion, not judicial determinations about custody or parenting time modification. The trial court here retained full authority to determine what, if any, modification to parenting time or custody should follow from the provider's assessment. Moreover, the trial court ordered the parties to "coordinate a review/status hearing in approximately 60 days to determine the status of the . . . IOP process." (App. Vol. II at 66.) Thus, unlike the trial court

in *A.R.R.*, the trial court here retained ongoing oversight of the IOP process and reserved to itself all decisions regarding Father's parenting time or custody. We therefore conclude the trial court did not impermissibly delegate its authority to modify parenting time or custody to the IOP provider.

## 4. Wagenblast's Fees

[30] Mother contends the trial court erred when it ordered her to pay half of all the fees charged by Wagenblast. Trial courts have broad discretion in allocating fees between parties under standard family law practice. *See*, *e.g.*, *In re Paternity of N.L.P.*, 926 N.E.2d 20, 23 (Ind. 2010) (noting "reasonableness of the guardian ad litem's compensation will likely be subject to the trial court's discretion"); *and see*, *e.g.*, *Van Wieren v. Van Wieren*, 858 N.E.2d 216, 224 (Ind. Ct. App. 2006) (decision whether to shift attorney fees from one party to another "left to the sound discretion of the trial court"). We review the trial court's decision as to the division of those fees for an abuse of discretion. *See* Ind. Code § 31-17-6-9 ("trial court *may* order either or both parents to pay" for GAL services) (emphasis added).

[31] In arguing the trial court abused its discretion, Mother notes some of Wagenblast's fees were incurred after Wagenblast was no longer GAL and instead was serving as Father's witness. Mother argues the court should have distinguished the $11,416.72 in fees for the work Wagenblast performed while appointed as GAL from the $3,245.00 in fees incurred because Father subpoenaed Wagenblast to be a witness at trial.

[32] Mother's argument is not without some basis in the law. For example, in *Calhoun v. Hammond*, we noted that "[f]ees are moneys due to witnesses and officers for services rendered in court . . . and are due from the party who procured the services." 345 N.E.2d 859, 861 (Ind. Ct. App. 1976) (quoting *Keifer v. Summers*, 35 N.E. 1103, 1104 (Ind. 1894)). Moreover, in *Evans v. Huss*, 415 N.E.2d 783 (Ind. Ct. App. 1981), we addressed the allocation of expert witness fees when one party uses another party's expert. There, the plaintiffs deposed the defendants' expert witness and then used that expert's deposition at trial in their case-in-chief. *Id*. at 784-85. We held "it is unfair that a party should have the benefit of another party's expert without bearing some of the costs." *Id*. at 787. The court concluded that where one party uses an opponent's expert witness, the trial court has equitable authority to require that party to pay the expert's fees, noting that "[t]hey called the tune and must pay the fiddler." *Id*. at 788.

[33] However, the facts before us are not precisely like *Evans*, as Father subpoenaed Wagenblast after Wagenblast had been appointed by the trial court rather than hired as an expert by Mother, and although Father "procured" Wagenblast's testimony for trial, *Calhoun*, 345 N.E.2d at 861, Wagenblast was testifying about information he obtained during his appointment as GAL. Under these circumstances, the trial court could have divided Wagenblast's fees in the manner that Mother desired, but it chose not to do so. We cannot say the trial court abused its broad discretion by dividing the fees equally between the parties.

## 5. Incarceration Unless Pay Attorney Fees

[34] Mother argues the trial court erred when it ordered her to serve a thirty-day jail sentence if she failed to pay $5,000.00 of Father's attorney's fees. Regarding sanctions as part of a contempt finding, we recently explained:

> The principal purpose of a civil-contempt proceeding is not to punish the contemnor but rather to coerce action for the benefit of an aggrieved party. While imprisonment necessarily has both punitive and deterrent effects, imprisonment as a sanction for contempt will be viewed as remedial rather than punitive when the court conditions release upon the contemnor's willingness to comply with the court's order from which the contempt finding was based. In other words, the contemnor must be given the opportunity to purge the contempt and gain release from prison.

*Tincher v. Sweat*, 247 N.E.3d 793, 798 (Ind. Ct. App. 2024) (quotations and citations omitted).

[35] In its order, the trial court found Mother in contempt and ordered her to comply with certain conditions[7] to purge herself of contempt. If Mother did not purge herself of contempt, she would be subject to a thirty-day jail sentence. Mother appeals the trial court's order that she, "in order to purge herself of the above contempt . . . shall pay $5,000.00 of Father's attorney fees within 90 days of today's date." (App. Vol. II at 65.) Mother argues the trial court could not

---

[7] One of those conditions was Mother's participation in IOP with a goal of reunification between Father and Children. Mother does not appeal that requirement.

require her to serve a jail sentence for failure to pay a debt because it violates her rights under Article 1, Section 22 of the Indiana Constitution.

[36] Article 1, Section 22 of the Indiana Constitution states, in relevant part, "there shall be no imprisonment for debt, except in case of fraud." Further, "a trial court may not use its contempt powers to enforce a *money judgment* requiring one party to pay the other party a fixed sum of money." *Mitchell v. Mitchell*, 871 N.E.2d 390, 395 (Ind. Ct. App. 2007) (emphasis in original). Such money judgments include those for attorney fees. *Bahre v. Bahre*, 230 N.E.2d 411, 415 (Ind. 1967). Thus, the trial court erred when it included payment of Father's attorney fees as a condition Mother must satisfy to purge herself of contempt. By conditioning her release from a thirty-day jail sentence on payment of $5,000 in attorney fees, the trial court impermissibly used its contempt powers to enforce a money judgment in violation of Article 1, Section 22 of the Indiana Constitution. We reverse that portion of the trial court's contempt order requiring Mother to pay $5,000 in Father's attorney fees within ninety days as a purge condition and remand with instructions to remove that requirement from the purge conditions. This does not, of course, mean that the trial court cannot order Mother to pay Father's attorney fees. On remand, the trial court may enter a money judgment for those fees pursuant to Indiana Trial Rule 69, which Father may then enforce through appropriate collection proceedings.

## Conclusion

[37] The trial court did not abuse its discretion when it admitted the Family House Records. Additionally, the trial court's findings supported its conclusion that transitioning from the status quo of Father not receiving his ordered parenting time into the IOP reunification process was in Children's best interests. Further, the trial court did not impermissibly delegate its judicial authority to a third party with its IOP order or abuse its discretion with its division of Wagenblast's fees. However, the trial court erred when it threatened Mother with incarceration if she did not pay a portion of Father's attorney fees. Accordingly, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

[38] Affirmed in part, reversed in part, and remanded.

Altice, C.J., and Foley, J., concur.

ATTORNEY FOR APPELLANT
Andrew P. Martin
Sachs & Hess, P.C.
St. John, Indiana

APPELLEE PRO SE
A.R.
Hammond, Indiana